JEANINE M. BAUERLE, APPELLEE, V.
DIRK A. BAUERLE, APPELLANT.
644 N.W.2d 128

Filed May 17, 2002. No. S-01-318.

Larry R. Baumann, of Kelley, Scritsmier & Byrne, P.C., for appellant.

George M. Zeilinger for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

HENDRY, C.J.

## INTRODUCTION

Jeanine M. Bauerle and Dirk A. Bauerle were divorced pursuant to a decree of dissolution entered by the Chase County District Court on February 23, 2001. In its decree, the district court approved the Bauerles' property settlement agreement and awarded alimony to Jeanine. The court ordered Dirk to pay alimony in the sum of $1,500 per month for 120 months. The court further ordered that Dirk's alimony obligation would not terminate upon Dirk's death or Jeanine's remarriage. Dirk appealed. We moved this case to our docket pursuant to our power to regulate the Nebraska Court of Appeals' caseload and that of this court. See Neb. Rev. Stat. § 24-1106(3) (Reissue 1995).

## FACTUAL BACKGROUND

Jeanine filed for divorce on June 23, 1999. At the trial on January 8, 2001, Dirk and Jeanine presented a property settlement agreement covering all issues regarding marital property and debt. The district court then resolved the three remaining issues: (1) alimony, (2) delinquent temporary support payments, and (3) attorney fees. The only issue raised by Dirk on appeal is the district court's award of alimony.

Dirk and Jeanine were married on October 18, 1980, in Longmont, Colorado. Shortly after their marriage, they moved from Colorado to Chase County, Nebraska, where they lived on a farm owned by Dirk's family, and in which Dirk had received an ownership interest from his parents. Although Dirk and Jeanine lived on the farm for only 3 to 4 months, they continued to farm this property after moving into town.

Prior to the marriage, Jeanine had obtained a 2-year associate of applied science secretarial degree from a junior college in Colorado. However, Jeanine did not pursue outside employment when the couple relocated to Nebraska. Instead, she worked on the farm with her husband, driving tractors and trucks. She also cleaned her in-laws' home and tended to their yardwork. In

addition, she generally bore sole responsibility for maintaining the family home, which involved cleaning, washing, cooking, and managing the couple's farm and personal bookkeeping.

After approximately 2 years, Jeanine stopped cleaning her in-laws' home, but she did not cease her work on the farm. Jeanine continued to drive a truck and a grain cart for the farm's corn and wheat harvests. She also operated tractors, pulled anhydrous ammonia tanks, helped irrigate fields, and ran farm errands. Jeanine received some payment for this work, but such payment was not made every year. When Jeanine was paid, she usually received $8 per hour. It was Jeanine's understanding that she was paid for her work because her compensation could be deducted from the farm's tax returns.

In 1988 or 1989, Jeanine enrolled in a quilting class. Soon after, she and her mother-in-law began to teach quilting. For approximately 10 years, Jeanine taught classes in quilting during the winter months when she had fewer farm and household duties.

In 1998, approximately 4 years prior to the divorce, Jeanine began part-time employment at a liquor store where she worked as a clerk and stocked shelves. She worked 10 to 20 hours per week and received the minimum wage, approximately $5.50 per hour. Jeanine's time at the liquor store was in addition to the hours she spent working on the farm and maintaining the family home. Jeanine managed this dual employment until filing for divorce in 1999, at which time she ceased working on the farm.

After filing for divorce in June 1999, Jeanine secured temporary employment with the Farm Service Agency (FSA) office in Imperial, Nebraska. Her initial position with FSA involved filing and labeling map slides for $10 per hour. Although Jeanine had an opportunity "to stay on a little longer" with FSA, such extended employment would have necessitated "knowledge in computer work," which Jeanine felt she did not possess. Jeanine's employment with FSA ended in September 1999.

Near the time Jeanine left FSA, she also ceased her employment at the liquor store in order to assist area farmers with the fall harvest. She helped the farmers defoliate beets by operating farm trucks and tractors.

In March 2000, Jeanine returned to her part-time position at the liquor store. In addition, she secured a temporary seasonal

job with a golf course, which paid $6 per hour. At the golf course, Jeanine mowed the lawn and worked in the clubhouse assisting customers. Between these two part-time jobs, Jeanine worked a combined total of 40 to 42 hours per week.

In January 2001, Jeanine was no longer working at the golf course because her position had ended with the arrival of winter weather. However, she was still working at the liquor store and had resumed teaching quilting classes. Jeanine charged approximately $30 per student for a 3-week course. Although the income from these classes varied depending upon the number of students, her class just prior to the divorce hearing consisted of 16 students, which netted approximately $350. Jeanine planned to continue teaching quilting on a monthly basis.

At the time of trial, Jeanine had not received any formal education since earning her 2-year secretarial degree almost 20 years earlier. Her secretarial experience was also limited to the time she had spent maintaining the couple's farm and personal records.

After filing for divorce, Jeanine considered pursuing employment possibilities at an insurance agency and a local school. However, the position with the insurance agency required "computer skills and computer knowledge" and would have resulted in less income than what she could earn at the golf course. The opportunity with the local school was not pursued after learning that the job description indicated that applicants with computer experience would be given preference.

Jeanine testified she desired business and computer training so she could secure a better job and start her own quilting business. She also testified she had limited financial resources and was waiting for funds from the divorce before enrolling in computer classes. She estimated the cost of these computer classes to be approximately $40 per credit hour at a local community college. Another option Jeanine testified she was considering was computer classes through the Internet which could result in a 4-year degree. She estimated this cost at $3,000 to $4,000.

Jeanine further testified that she had been living in a low-rent housing unit in Imperial since January 2000. The apartment rent was $225 per month, but Jeanine anticipated that the rent would probably change once she obtained her share of the property settlement agreement. She estimated that her income was $700 per

month and that her expenses were $1,742.66, resulting in a shortfall of $1,042.66.

At the time of trial, Dirk was still working on the family farm with his brother and his parents. The family farming operation included livestock, together with crops consisting of corn, pinto beans, and wheat. Several farming entities, referred to as "D & D Bauerle, JV," "3-D Farms, JV," "Champion Valley Enterprises, LLC," and "B Barr Farms, Inc.," contained the various family members' interests in the farming operation. Many of Dirk's interests in these entities were given to him by his parents. In addition to these entities, Dirk and Jeanine also maintained their own personal farm account.

According to Dirk's balance sheet, his net worth at the time of trial, which included his interests in the farming entities, was $422,177. Dirk estimated that his living expenses were $1,936.60 per month. He also offered an amortization schedule for payments he is obligated to make on a $110,000 loan at 9 percent interest. Dirk stated that he must pay $1,393.43 per month for 10 years to retire the loan he incurred as a result of agreeing to provide Jeanine $110,000 as part of the parties' property settlement. Dirk also testified that his personal finances would be impacted due to the overall rising costs of fuel, fertilizer, pesticides, irrigation, repairs, and harvesting between 1999 and 2000.

Robert McChesney, a certified public accountant, testified on behalf of Jeanine regarding the Bauerles' tax returns from previous years. He testified that the Bauerles' 1998 and 1999 tax returns showed a significant decrease in adjusted gross income due to losses passing through the farming entities in which the Bauerles held interests. McChesney further explained that the cause of a reflected loss in Champion Valley Enterprises, one of the entities, was due to counting prepayments for feed and pigs as expenses without reflecting the market values on the entity's inventories. McChesney found that such prepaying of expenses distorted the Bauerles' recent tax returns because the losses were reflected but the income had not yet been included. Excluding the Champion Valley Enterprises loss, McChesney stated that the Bauerles' farm income was "fairly consistent with ranges" between $45,000 and $60,000 per year. McChesney also testified that the Bauerles would receive approximately

$17,500 in refunds from prior tax returns due to "carry back loss" that resulted from their decisions in 1998 and 1999 not to claim "outright" the depreciation on purchases of new equipment, which differed from previous years in which they had claimed the depreciation "outright."

The district court entered the decree of dissolution on February 23, 2001. In it, the court approved the Bauerles' property settlement agreement. The agreement stated that Jeanine brought $1,500 in assets into the marriage, while Dirk brought approximately $41,000 in assets into the marriage. The agreement awarded Jeanine a 1996 Ford Explorer, household goods valued at approximately $12,000, a $2,700 debt owed to her, and a bank account, for a total award of approximately $32,500. Dirk received the remaining property and liabilities in the marriage, which taken together, were valued at over $350,000. As part of the agreement, Dirk also agreed to pay Jeanine $110,000.

In the decree, the court further found that alimony should be awarded to Jeanine based on its findings that (1) the marriage was one of long duration, (2) most of the Bauerles' assets were accumulated after the marriage, (3) most of the Bauerles' income was used to purchase assets Dirk uses in the farming operation, and (4) Dirk's net monthly income was approximately $4,632. The court ordered that an award of alimony in the sum of $1,500 per month for 120 months would be paid to Jeanine and would not terminate upon the death of Dirk or the remarriage of Jeanine. Dirk appealed.

## ASSIGNMENTS OF ERROR

Dirk assigns, rephrased, that the district court erred in (1) determining the amount and duration of Dirk's alimony obligation and (2) ordering that Dirk's obligation to pay alimony would not terminate upon Dirk's death or Jeanine's remarriage.

## STANDARD OF REVIEW

In actions for dissolution of marriage, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. This standard of review applies to the trial court's determinations regarding division of property, alimony, and attorney fees. *Heald v. Heald*, 259 Neb. 604, 611 N.W.2d 598 (2000).

■ In a review de novo on the record, an appellate court reappraises the evidence as presented by the record and reaches its own independent conclusions with respect to the matters at issue. *Carter v. Carter*, 261 Neb. 881, 626 N.W.2d 576 (2001).

■ In reviewing an alimony award, an appellate court does not determine whether it would have awarded the same amount of alimony as did the trial court, but whether the trial court's award is untenable such as to deprive a party of a substantial right or just result. *Kalkowski v. Kalkowski*, 258 Neb. 1035, 607 N.W.2d 517 (2000); *Pope v. Pope*, 251 Neb. 773, 559 N.W.2d 192 (1997).

■ A judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrains from acting, and the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters submitted for disposition through a judicial system. *Crawford v. Crawford, ante* p. 37, 638 N.W.2d 505 (2002).

## ANALYSIS

### GRANT OF ALIMONY

In his first assignment of error, Dirk argues that the district court abused its discretion by awarding Jeanine alimony in the sum of $1,500 per month for 120 months. He contends that an award of such an amount and duration "cannot possibly be considered reasonable or fair" under the specific criteria for alimony awards in Neb. Rev. Stat. § 42-365 (Reissue 1998). Brief for appellant at 13. Section 42-365 states:

> When dissolution of a marriage is decreed, the court may order payment of such alimony by one party to the other and division of property as may be reasonable, having regard for the circumstances of the parties, duration of the marriage, a history of the contributions to the marriage by each party, including contributions to the care and education of the children, and interruption of personal careers or educational opportunities, and the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of such party. . . .

. . . The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances and the other criteria enumerated in this section make it appropriate.

In considering the specific criteria of § 42-365 concerning an award of alimony, a court's "polestar" must be "fairness and reasonableness as determined by the facts of each case." See *Meints v. Meints*, 258 Neb. 1017, 1022, 608 N.W.2d 564, 568 (2000). Stated another way, in determining whether alimony should be awarded, in what amount, and over what period of time, the ultimate criterion is reasonableness. *Kalkowski, supra.*

As the district court noted, Dirk and Jeanine's marriage was one of long duration. The record reflects that they were married and worked together on the family farm for almost 20 years. Dirk and Jeanine are each 42 years old. They did not have children during their marriage, so they will be able to engage in gainful employment without interfering with the interests of any minor children. While Dirk is able to continue working on the farm with machinery and other resources purchased during the marriage, Jeanine must find a new career. She desires to start a quilting business and work with computers. However, the skills she attained two decades ago while earning her secretarial degree are of minimal use to her at the present time. Jeanine has had little opportunity to utilize these secretarial skills, having spent the past 20 years primarily working with Dirk on the family farm.

Jeanine's contributions to the marriage were significant. She maintained the family household by cleaning, washing, cooking, and doing the couple's farm and personal bookkeeping. On the farm, she operated tractors, pulled anhydrous ammonia tanks, helped irrigate fields, ran farm errands, and drove a truck and a grain cart for the family's various harvests. Dirk brought approximately $41,000 in assets into the marriage in 1980, but he leaves the marriage with over $240,000. Jeanine's efforts played a significant role in that increase. As Jeanine stated at trial, "I feel like I've sacrificed a lot of years of my life helping him, working on the farm."

Any award of alimony to Jeanine should not be used to equalize the incomes of the parties or to punish Dirk. See *Kalkowski v. Kalkowski*, 258 Neb. 1035, 607 N.W.2d 517 (2000).

However, it may be used to assist Jeanine during a reasonable time to bridge that period of unavailability for employment or during that period to get proper training for employment. See, *Murrell v. Murrell*, 232 Neb. 247, 440 N.W.2d 237 (1989); *Kimbrough v. Kimbrough*, 228 Neb. 358, 422 N.W.2d 556 (1988). Jeanine desires to secure employment beyond her minimum-wage, part-time jobs which will allow her to achieve a standard of living that resembles the one she helped maintain in her marriage to Dirk. In order to do this, she will need time and money to receive additional education.

Dirk argues that the district court's alimony award was excessive when considering the incomes of the parties and Jeanine's ability to work. This court has previously noted that "in awarding alimony, a court should consider, in addition to the specific criteria listed in § 42-365, the income and earning capacity of each party as well as the general equities of each situation." *Kelly v. Kelly*, 246 Neb. 55, 64, 516 N.W.2d 612, 617-18 (1994).

The district court found that Dirk's net income was $4,632 per month, or $55,584 per year. This is consistent with the testimony of McChesney, the certified public accountant, who testified that the Bauerles' farm income ranged between $45,000 and $60,000 per year. According to the budget Dirk offered at trial, Dirk's monthly expenses are $1,936.60. Thus, Dirk's income without any alimony obligation would exceed his expenses by $2,695.40 per month. Dirk argues, however, that this court should also include in its calculations Dirk's monthly payment of $1,393.43 on the $110,000 loan he incurred to satisfy his obligations to Jeanine pursuant to the property settlement agreement. The record shows that Dirk voluntarily chose to borrow the $110,000 and incur this expense rather than liquidate $110,000 of the assets he received under the property settlement agreement. Having voluntarily determined to utilize a portion of his assets in this manner, we determine that under this record, Dirk's argument is without merit.

According to Jeanine's budget, her net income was $700 per month, or $8,400 per year. Her estimated monthly expenses were $1,742.66. Thus, Jeanine's expenses exceed her income by $1,042.66 per month. Dirk argues that Jeanine's budget is inaccurate because it contained "guesses" of certain expenses, inter

alia, apartment rent and utilities, and included an automobile loan obligation she did not have. Dirk testified that Jeanine's budget should have included interest income at a "safe return" of "six and a half" percent on the $110,000 Jeanine received under the property settlement agreement.

 Even if one were to eliminate the car payment and further "adjust" Jeanine's budget by the difference between her claimed and actual expenses for apartment rent and utilities, and add $596 of interest income using Dirk's "safe return" of "six and a half" percent, we find that Jeanine's "adjusted" income exceeds her expenses by only $148 per month. This sum does not include any consideration of costs for Jeanine's computer classes. Even with this "adjustment" of Jeanine's budget, there is a significant disparity between Dirk's monthly income after expenses of $2,695.40 and Jeanine's monthly income after expenses of $148. " 'Disparity in income or potential income may partially justify an award of alimony.' " *Ainslie v. Ainslie*, 249 Neb. 656, 660-61, 545 N.W.2d 90, 94 (1996) (quoting *Thiltges v. Thiltges*, 247 Neb. 371, 527 N.W.2d 853 (1995)).

 In *Ainslie*, 249 Neb. at 661, 545 N.W.2d at 94, the court stated:

> " 'In entering a decree for alimony, the court may take into account all of the property owned by the parties at the time of entering the decree, whether accumulated by their joint efforts or acquired by inheritance, and make such award as is proper under all the circumstances disclosed by the record.' "

(Quoting *Hefti v. Hefti*, 166 Neb. 181, 88 N.W.2d 231 (1958).) As a result of the property settlement agreement, Dirk received property valued in excess of $240,000, whereas Jeanine received property valued at approximately $142,500. Dirk's property allocation contained significant income producing assets such as savings bonds, interests in farming entities, and farm machinery, including 21 antique tractors that Dirk uses in his farmwork. This disparity in potential income may also partially justify the award of alimony. See *Ainslie, supra.*

 In reviewing an alimony award, an appellate court does not determine whether it would have awarded the same amount of alimony as did the trial court, but whether the trial court's

award is untenable such as to deprive a party of a substantial right or just result. *Kalkowski v. Kalkowski*, 258 Neb. 1035, 607 N.W.2d 517 (2000); *Pope v. Pope*, 251 Neb. 773, 559 N.W.2d 192 (1997). Furthermore, an appellate court is not inclined to disturb the trial court's award of alimony unless it is patently unfair on the record. *Priest v. Priest*, 251 Neb. 76, 554 N.W.2d 792 (1996). Considering Dirk and Jeanine's circumstances under the "ultimate criterion . . . of reasonableness," see *Kalkowski*, 258 Neb. at 1044, 607 N.W.2d at 525, we determine the award of alimony by the district court was not an abuse of discretion, as it neither deprived Dirk of a substantial right or just result, nor was it patently unfair. Dirk's first assignment of error is without merit.

### Termination of Alimony

In his second assignment of error, Dirk argues that the district court abused its discretion in ordering that Dirk's obligation to pay alimony would not terminate upon Dirk's death or Jeanine's remarriage. Dirk asserts there is nothing in his or Jeanine's circumstances that would support a departure from the default provisions of § 42-365, and he maintains that the district court's provisions are "unreasonably harsh and burdensome." Brief for appellant at 20.

Section 42-365 states in part, "Except as otherwise agreed by the parties in writing or by order of the court, alimony orders shall terminate upon the death of either party or the remarriage of the recipient." The statute specifically allows a court to determine "by order of the court" that an alimony award will *not* "terminate upon the death of either party or the remarriage of the recipient." Although § 42-365 lists specific circumstances which are to be considered in making any alimony award, it does not provide specific guidance for determining when it is appropriate for a court to determine that such award will not terminate on the parties' deaths or the recipient's remarriage. However, this court and other courts have found certain circumstances significant in cases with similar termination provisions. While it is impossible to provide an exhaustive list of such circumstances, we discuss some of them below.

■ Serious health problems experienced by either party may support an award of alimony which does not terminate according to the default provisions of § 42-365. For example, in *Cole v. Cole*, 208 Neb. 562, 304 N.W.2d 398 (1981), this court modified an alimony award to provide $800 per month for 25 years and ordered that the award would not terminate on the obligor spouse's death. In that case, the recipient spouse had been seriously injured while riding as a passenger on a motorcycle. She was paralyzed from the chest down and had only partial use of her arms and hands. Similarly, in *Hafer v. Hafer*, 3 Neb. App. 129, 524 N.W.2d 65 (1994), the recipient spouse contracted multiple sclerosis during the marriage and, as a result, was completely unemployable. The Court of Appeals determined that the recipient spouse should receive an alimony award of $300 per month until the death of either party. The court specifically found that "[t]his award of alimony is not to terminate automatically upon the remarriage of the [recipient spouse]." *Id.* at 137, 524 N.W.2d at 71.

■ Another circumstance which may support a trial court's decision to vary the termination provisions of § 42-365 is the recipient spouse's inability to work or improve his or her earning capacity. See, e.g., *Hafer, supra* (recipient spouse unemployable because of multiple sclerosis); *Sommer v. Sommer*, 636 N.W.2d 423, 429 (N.D. 2001) (permanent spousal support appropriate where disadvantaged spouse is at such an age where it is impossible to restore him or her " 'to independent economic status or to equalize the burden of divorce by increasing the disadvantaged spouse's earning capacity' ").

■ An obligor spouse's tenuous financial condition or unique economic circumstances have also been considered in evaluating an alimony award that will not terminate on the obligor's death or the recipient spouse's remarriage. For example, in *Hildebrand v. Hildebrand*, 239 Neb. 605, 477 N.W.2d 1 (1991), this court increased an alimony award to $400 per month for the recipient spouse's life, even if she remarried. The court found that since the parties had been married to each other previously, a lifetime award of alimony was an appropriate method of dealing with the obligor spouse's pension funds,

which were not considered as marital property in the first divorce proceeding.

In *Pyke v. Pyke*, 212 Neb. 114, 321 N.W.2d 906 (1982), the obligor husband was a lieutenant colonel in the U.S. Air Force who planned to retire from the service in 2 years. The district court awarded the wife $850 per month until the death of either party " 'or until further order of the court.' " *Id.* at 117, 321 N.W.2d at 909. The district court also ordered that the alimony award would not terminate on the remarriage of the wife, "but that such remarriage could be considered as a change of circumstance to be considered by the court at some future time, together with any other relevant circumstances in regard to the earning capacity of either of the parties." *Id.* In reviewing the district court's award, this court noted the husband's anticipated retirement in 2 years and stated:

> It would appear that where, as here, the court is now mindful that a significant event is to occur in the near future which may alter the earning abilities of either of the parties, but the court is unable to determine what that amount is, an order such as that entered by the court in this case is appropriate.

*Id.* at 120, 321 N.W.2d at 910. See, also, *Vandal v. Vandal*, 31 Conn. App. 561, 626 A.2d 784 (1993) (upholding award of alimony which did not terminate on wife's remarriage based on finding that husband, due to significant personal debt, was financially unable at time of dissolution to pay alimony in amount to which wife was rightfully entitled).

The specific criteria in § 42-365, such as duration of the marriage, contributions to the marriage, and contributions to the care and education of the children, are also appropriate circumstances for consideration in determining that alimony not terminate on the obligor's death or the recipient spouse's remarriage. In *Erickson v. Erickson*, 202 Neb. 345, 275 N.W.2d 287 (1979), we found each of the statutory factors listed in § 42-365 significant in granting a nonmodifiable and nonterminable award of alimony. This court stated:

> [T]he trial court did not adequately consider the fact that respondent interrupted her nursing education by her marriage to petitioner and her subsequent raising of the

children; and that she has now had to leave the family home, establish a new home for herself and the children, and undertake a 3-year program of education before she will be able to provide sufficient earnings to make up the difference between the actual cost of supporting the two small children and the meager amount petitioner is able to pay. She will have a difficult and expensive period of readjustment and no assets with which to pay for it. In addition, petitioner paid no temporary child support or temporary alimony after the December 1976 separation, and he has had the use and possession of the farm home and the 80 acres since that time.

*Id.* at 350-51, 275 N.W.2d at 291.

In the present case, the district court made no specific findings in support of its determination that the alimony award not terminate on Dirk's death or Jeanine's remarriage. Furthermore, in our de novo review of the record, we do not find facts to support the imposition of such conditions. We recognize that Dirk and Jeanine's marriage was of long duration and that Jeanine contributed significantly to the marriage. However, there were no children as a result of this marriage, nor is there any evidence in the record that Jeanine or Dirk have health problems or economic circumstances which would justify departing from the default termination provisions of § 42-365. For these reasons, we determine the district court abused its discretion. The court's determination that Dirk's alimony obligation would not terminate upon Dirk's death or Jeanine's remarriage was untenable and unfairly deprived Dirk of a substantial right and a just result. See *Crawford v. Crawford, ante* p. 37, 638 N.W.2d 505 (2002). Accordingly, we modify the decree of dissolution to provide that Dirk's alimony obligation "shall terminate upon the death of either party or the remarriage of the recipient." See § 42-365.

## CONCLUSION

For the foregoing reasons, the district court's decree of dissolution is affirmed as modified.

AFFIRMED AS MODIFIED.