IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

CONSBRUCK V. CONSBRUCK

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

KAYLA MARIE CONSBRUCK, APPELLEE,

V.

TODD EDWARD CONSBRUCK, APPELLANT.

Filed March 29, 2016.    No. A-15-507.

Appeal from the District Court for Cuming County: JAMES G. KUBE, Judge. Affirmed in part, and in part reversed and remanded with directions.

Donald A. Roberts and Britt H. Dudzinski, of Lustgarten & Roberts, P.C., L.L.O., for appellant.

Shane J. Placek, of Sidner Law, for appellee.

MOORE, Chief Judge, and IRWIN and BISHOP, Judges.

MOORE, Chief Judge.

## I. INTRODUCTION

Todd Edward Consbruck appeals from orders entered by the district court for Cuming County dissolving his marriage to Kayla Marie Consbruck and overruling his motion for new trial or, in the alternative, motion to alter or amend. On appeal, Todd asserts that the district court erred in determining parenting time, child support, alimony, property division, and property equalization. For the reasons set forth below, we affirm in part and in part reverse and remand with directions.

## II. BACKGROUND

Todd and Kayla were married in 1993 in Wisner, Cuming County, Nebraska. They are the parents of two minor children who were born in 2005 and 2008 respectively. Kayla filed a

- 1 -

complaint for dissolution of marriage in the district court for Cuming County on December 2, 2013.

## 1. TEMPORARY ORDER

The court entered a temporary order on January 22, 2014 upon the oral stipulation of the parties. The court awarded temporary joint legal custody of the children to the parties and temporary physical custody to Kayla subject to Todd's parenting time, which consisted of every other week from Wednesday after school until Monday morning when Todd delivered the children to school. Additionally, during the weeks when Todd did not have his alternating weekend parenting time, he was granted parenting time on Wednesday evenings from after school until 8:00 p.m.

The court ordered Todd to pay child support in an amount of $1,000 per month. This amount was reached after considering the parties' respective child support worksheets and as a "negotiated average" between the two amounts proposed by the parties. Kayla's worksheet listed her total monthly income at $3,529.48 and Todd's total monthly income at $7,984. Todd's worksheet listed his total monthly income at $7,056 and Kayla's total monthly income at $4,077.

## 2. TRIAL AND DECREE

On November 3, 2014, a trial was held on the matters of legal and physical custody, parenting time, child support, alimony, and the division of the marital estate.

Both of the parties testified at trial. Witnesses testifying for Kayla included David Oelkers and Greta Roth. Oelkers, a certified public accountant, testified regarding Kayla's income and her involvement/ownership in several family entities. Roth, Kayla's mother, also testified regarding these matters. Kayla also presented the testimony of Julia Eckmann, a friend of Kayla's; Ann Kirchmann, the daycare provider for the minor children; and Joani Meier, a parent whose child has shared activities with one of Kayla and Todd's minor children.

Witnesses testifying for Todd included three of his co-workers, Rhett Eckmann, M.D., Sister Joy Rose, and Ronald O. Briggs. Todd also presented the testimony of Carol Kampschnieder, a longtime acquaintance of Kayla and Todd, and Thomas Logue, a friend of Todd's and a semi-professional fisherman with whom Todd has worked.

Various exhibits were received into evidence. These exhibits included a joint property and debt statement, Kayla's pay stubs, an insurance policy covering Kayla, documentation pertaining to Kayla's Edward Jones IRA accounts, checks to Kayla from the T.A.K.T. Cattle Company, Inc., Todd's travel schedule including his work as a semi-professional fisherman, a recent pay stub from Todd's employer, the parties' monthly living expenses, the parties' proposed parenting plans and child support calculations, a draft mediated parenting plan, copies of numerous texts and emails, tax returns, and other various financial and real estate documentation.

### (a) Evidence Concerning Custody and Parenting Time

Todd testified that during the marriage he was the primary source of income, while Kayla also worked but for lesser pay, and that he always thought of their family as "a wonderful, traditional, intact family." He stated that while Kayla definitely did more for the children when

they were infants, he has been very involved in the care of the children since. To various degrees prior and subsequent to the separation, Todd has helped the children with showers and their morning and evening routines, dropped them off at school and daycare, watched over the children at home while Kayla attended parent-teacher conferences, cooked and cleaned, purchased clothing and toys for the children, conducted outdoor activities with the children, disciplined the children, and otherwise has cared for the children and been involved in their lives. Todd indicated that the parties have different interests, with Kayla being more focused on athletics while Todd is interested in reading, learning, and the outdoors. Todd thought that this was a "wonderful mix" of traits for parents to have. Other witnesses generally confirmed that Todd has been an involved parent.

Todd asked the court to maintain joint legal custody and also to grant joint physical custody. Todd believes that a co-parenting arrangement would be best for the children moving forward. He asserts that both parents need to be able to communicate regarding major life events and disciplinary issues, and that the health and success of the children depends on both parties being able to do so. The parties generally do not disagree regarding issues of school choice, religion, and which doctors to visit. Both parties testified that the children have done well academically, and this did not change following the separation.

In line with his co-parenting stance, Todd proposed an alternating weekly parenting time schedule with each party having a middle of the week evening with the children during the other party's parenting time. The parties had already come to an agreement regarding holiday parenting time. The parties also agreed on a provision granting Kayla time with the children each year to attend the Cuming County Fair.

Kayla, on the other hand, requested that she be awarded both sole legal and physical custody, with a standard visitation schedule for Todd, which proposal reduced Todd's parenting time from that provided in the temporary order.

Kayla testified to being the primary caretaker of the children following their birth, taking care of their hygiene, feeding them, caring for them when sick, organizing their activities, etc., and having continued these duties since the separation. Further, Kayla asserted that she handled the family's finances, household chores, grocery shopping, and much of the outdoor maintenance of the family's acreage.

Kayla testified that after the children were born, Todd traveled often for work and as a semi-professional fisherman. These trips created marital conflict due in part to Todd not attending the children's activities. When Kayla expressed her dislike of Todd's absence from the children's lives, she claims that he would react negatively. Due to Todd's argumentative tone, over time Kayla quit complaining about his travels.

Since the separation, Kayla claims to have sent a detailed schedule of the children's activities to Todd every month so he knows when and where the children need to be during his parenting time, and that even prior to separation, Todd was always aware of what activities the children participated in. One purpose of these schedules is to decrease potential anxiety for the children. Kayla was unaware of any instances where the children missed a scheduled event during Todd's parenting time, with the exception of a swim meet. Kayla testified that Todd has never enrolled the children in activities or been involved in organizing their schedules. Kayla has offered to continue organizing the children's schedules and creating these calendars.

Kayla also specified that she communicates with Todd and provides him with an opportunity to give feedback prior to enrolling the children in activities and regarding the children's therapist appointments. Kayla testified that both parties have shared the responsibility of dropping off and picking up the children at school pursuant to the temporary order without difficulty and without the need for communication between the parties.

Kayla asserted that neither the parenting time schedule in the temporary order nor an equal co-parenting arrangement are in the best interests of the children. She claims that the current schedule is causing instability; specifically that she sees unrest, unruliness, and anxiety in the children when they return to her home on Mondays. Kayla feels that the children need a more regular routine. Kayla testified that the co-parenting schedule proposed by Todd would create additional scheduling difficulties and would be hard to orchestrate due to poor communication between the parties. Kayla feels that the parties' attempt to co-parent during the 10 months leading to trial was a failure because their "communication is terrible." It appears that the parties communicated mostly by e-mail and text messaging. Kayla proposed a schedule wherein Todd received parenting time every other weekend and 6 weeks during the summer with Kayla having physical custody for the remainder, together with the agreed upon holiday visitation time and annual visit to the Cuming County Fair.

(b) Employment and Income Evidence

Kayla has a college education. When Kayla was 23 years old, she relocated from Lincoln, Nebraska to West Point upon her engagement to Todd and his decision to take a job in that city. Todd had been offered several jobs, one of them being in West Point. Kayla preferred that Todd accept the job in West Point because she had grown up in Cuming County, it would be close to her family, and it was the best job offer currently available to Todd. Further, Kayla testified that they had always considered moving to a small town.

Prior to their relocation, Kayla was employed at the University of Nebraska food-processing center in Lincoln. Kayla had a salary in the $20,000-$30,000 range. She had a job in place in West Point prior to their move. However, she claims to have taken a "substantial cut" in salary of approximately $10,000, and felt that she had made a sacrifice to facilitate the move.

Kayla has been employed by a pharmacy in West Point, Nebraska since 1996. Kayla's primary job title is pharmacy tech, but she also does bookkeeping, marketing and insurance work for the pharmacy. Kayla works 35 hours per week as a full-time employee with a salary of approximately $32,000. Additionally, Kayla currently receives a $480 health insurance reimbursement as a result of her coverage under Todd's insurance, however, she will not receive this once the divorce is final.

Kayla has received additional income from the local hospital foundation for her work in assisting with an annual fundraiser and handling other paperwork. The W-2 statements for 2011 and 2012 show this income to be $780 and $620, respectively. The 2013 income tax statement did not have any of the parties' W-2 statements attached. Kayla has also received various income from two family owned entities, T.A.K.T Cattle Company, Inc. and Roth Agra; and from a trust established by her mother, Greta Roth.

T.A.K.T. Cattle Company was a commercial cattle-feeding company, formed in 1979. The initial funding of T.A.K.T consisted of gifts that the four children of Roth, including Kayla, had received from their grandparents. Roth testified that Kayla did not contribute money to T.A.K.T. Income was distributed to Kayla based on her one-fourth ownership in the company. The company was dissolved in 2012, at which point each of Roth's children, including Kayla, received a distribution check. Kayla's distribution occurred on December 26, 2012 and was in the amount of $112,958.

Roth Agra is a corporation set up by Roth and her husband. Roth's children, including Kayla, are shareholders and directors of Roth Agra and receive a director's fee of approximately $500 every year. Kayla received $2,800 in ordinary dividends from Roth Agra in 2011 and 2012, and approximately $2,280 in 2013.

Roth established a trust for the purpose of transferring land to her grandchildren, the ultimate beneficiaries of the trust. Kayla is the income beneficiary of the trust during her lifetime. According to Oelkers, the trust had no income in 2012, income of $17,000 in 2013, and distributed $7,500 to Kayla in 2014 to enable her to pay the income taxes on the 2013 income that she did not receive but was required to report. Stated another way, the $7,500 distribution was for the purpose of reimbursing Kayla for capital gains or dividends that she would need to report on her income tax return resulting from the 2013 trust income. The balance of the 2013 income from the trust was retained by the company to repay debt and to provide a cash reserve for real estate tax payments. Oelkers anticipated there being additional trust income in the future. The parties' 2013 tax return shows passive income/gain from the trust of $15,986, which is slightly less than the figure testified to by Oelkers.

Kayla estimated that her total monthly income from all sources is approximately $3,049, which was not sufficient to cover her monthly expenses of $3,676.

Todd has a college degree as well as a master's degree in health administration. Todd is employed at the local hospital in West Point as the executive director of clinical services and communication. Todd testified that determining his income was "complicated" because "we run our health insurance through our pay and then it's deducted out." His W-2 statements for 2011 and 2012 show that his wages were $57,734 ($65,762 social security wages) and $59,709 ($67,997 social security wages), respectively. The 2013 tax return did not contain W-2 statements, but Todd indicated that his 2013 income was between $70,000 and $72,000. Todd's paystub for the period ending June 28, 2014 shows year-to-date regular gross earnings of $33,580. The paystub also shows bonus income of $14,015 which Todd testified was his bonus for the year 2013 but received in 2014. Todd agreed that he typically receives a bonus each year, which amount fluctuates based upon a formula which is dependent on the financial condition of the hospital at the end of the calendar year. The paystub also includes miscellaneous income of $4,005, however, Todd did not know what this amount is derived from. Finally, the paystub showed income of $4,152 for "ETO", which Todd indicated was vacation.

Kayla requested alimony in an amount of $1,500 per month for a term of 5 years, based on the circumstances of the parties, and the length of their marriage. Todd's position was that there should be no award of alimony.

(c) Evidence Regarding Disputed Property

Kayla owns four Edward Jones retirement accounts, three of which the parties agreed are marital property. However, Kayla claimed that the account ending in 617 was a nonmarital asset because it had always been solely in her name; it was initially funded by her parents in 1987, long before the marriage; and she had never made any contributions to this account. The record shows that Kayla's parents bought stock in 1987 which was placed into the Edward Jones account. Todd disputed that this account was a nonmarital asset, however, he had no knowledge or evidence that any marital money was used to fund the account. Although the parties differed in some respects with regard to the values of the balance of their property, there are no other issues with regard to the classification or division of the property and debts other than this account.

(d) Order

On January 23, 2015, the district court entered an order dissolving the marriage and granting Kayla sole legal and physical custody of the children, subject to Todd's parenting time, which the court established as every other weekend from Wednesday after school until the following Sunday at 7:00 p.m., and one evening during Todd's off-week from when the children get out of school until 7:30 p.m.

After finding Todd and Kayla's monthly gross incomes to be $7,690 and $3,065 respectively, the court ordered Todd to pay child support in the amount of $1,174 per month when there are two minor children and $765 per month when there is one minor child. Todd was also ordered to pay $500 per month in alimony for 24 months, or until $12,000 is paid, and an amount of $112,137 to Kayla "forthwith" in order to equalize the estates of the parties. In making these calculations, the court treated Kayla's Edward Jones retirement account ending in 617 as a nonmarital asset. Lastly, the court held that each party shall be responsible for the payment of their own attorney fees and costs.

3. MOTION FOR NEW TRIAL/MOTION TO ALTER OR AMEND

On January 30, 2015, Todd filed a motion for new trial or, in the alternative, motion to alter or amend. The motion alleged that the court erred in reducing Todd's parenting time, in its calculation of child support and alimony, in failing to include two marital vehicles possessed by Kayla at the time of separation as her assets, in ruling that Todd should pay the property equalization payment "forthwith," and in failing to include Kayla's Edward Jones retirement account ending in 617 as a marital asset.

On May 13, 2015, the court entered an order overruling the motion for new trial. However, the court sustained a portion of the motion to alter or amend and increased Todd's weekend parenting time so that it ended on Monday morning instead of Sunday evening, as was previously ordered in the temporary order. All other aspects of the parenting time provisions remained the same, including Todd's one evening during the off-week as the parties shall agree, from when the children get out of school until 7:30 p.m.

Todd subsequently perfected this appeal.

## III. ASSIGNMENTS OF ERROR

Todd assigns, restated, that the district court erred in (1) limiting his parenting time, (2) calculating the parties' income for the purpose of determining Todd's child support obligation, (3) the award of alimony, (4) failing to include Kayla's Edward Jones retirement account ending in 617 in its property division calculation as a marital asset, and (5) ordering Todd to pay a property equalization payment "forthwith" rather than through a Qualified Domestic Relations Order.

## IV. STANDARDS OF REVIEW

Child custody and visitation determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015).

An appellate court also reviews a trial court's determinations on matters such as child support, alimony, and the division of property de novo on the record to determine whether the trial judge abused his or her discretion. See *Anderson v. Anderson*, 290 Neb. 530, 861 N.W.2d 113 (2015).

In a review de novo on the record, an appellate court reappraises the evidence as presented by the record and reaches its own independent conclusions with respect to the matters at issue. However, where the credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the circumstances that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Heald v. Heald*, 259 Neb. 604, 611 N.W.2d 598 (2000). See, also, *Anderson v. Anderson*, 290 Neb. 530, 861 N.W.2d 113 (2015); *Cesar C. v. Alicia L.*, 281 Neb. 979, 800 N.W.2d 249 (2011); *State on behalf of Pathammavong v. Pathammavong*, 268 Neb. 1, 679 N.W.2d 749 (2004).

An abuse of discretion occurs when a trial court bases its decision upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015). A judicial abuse of discretion requires that the reasons or rulings of the trial court be clearly untenable insofar as they unfairly deprive a litigant of a substantial right and a just result. *Id.*

An appellate court reviews a denial of a motion for new trial or, in the alternative, to alter or amend the judgment, for an abuse of discretion. *InterCall, Inc. v. Egenera, Inc.*, 284 Neb. 801, 824 N.W.2d 12 (2012).

## V. ANALYSIS

### 1. PARENTING TIME

On appeal, Todd claims the district court erred in its limitation of his parenting time by not expanding it beyond that contained within the temporary order. Specifically, he argues that such a limitation was contrary to the evidence and testimony before the court and the court's own findings.

Todd's primary argument at trial was that he wants to spend more time with his children, and has designated this as the "most important issue on appeal." Todd claims to have demonstrated

the parties' ability to co-parent the children, and that it would be in the children's best interests to have more parenting time with him.

The Nebraska Parenting Act recognizes that the best interests of children require a parenting arrangement and parenting plan which provides for a child's safety, emotional growth, health, stability and physical care and regular and continuous school attendance and progress. Neb. Rev. Stat. § 43-2923(1). The Act sets forth a non-exhaustive list of factors to be considered in determining the best interests of a child in regards to custody and parenting arrangements. Such factors include the relationship of the minor child with each parent, the desires of the minor child, the general health and wellbeing of the minor child, credible evidence of abuse inflicted on any family or household member, and credible evidence of child abuse or neglect or domestic intimate partner abuse. Neb. Rev. Stat. § 43-2923(6).

The Nebraska Supreme Court has also held that courts should determine "the nature and extent of visitation rights on a case-by-case basis" and may consider many factors and circumstances in each individual case, such as:

> the age and health of the child; the character of the noncustodial parent; the place where visitation rights will be exercised; the frequency and duration of visits; the emotional relationship between the visiting parent and the child; the likely effect of visitation on the child; the availability of the child for visitation; the likelihood of disrupting an established lifestyle otherwise beneficial to the child; and, when appropriate, the wishes of the child.

*Fine v. Fine*, 261 Neb. 836, 843, 626 N.W.2d 526, 532 (2001).

While the Parenting Act recognizes the importance of both parents remaining active and involved in parenting in order to serve the best interests of the child, the statutes do not require the district court to grant equal parenting time or joint custody to the parents if such is not in the child's best interests. See Neb. Rev. Stat. § 43-2923(3); *Kamal v. Imroz*, 277 Neb. 116, 759 N.W.2d 914 (2009); *Klimek v. Klimek*, 18 Neb. App. 82, 775 N.W.2d 444 (2009) (court did not abuse its discretion in failing to find joint custody was in best interests of minor children when the parties had difficulty communicating with each other).

At trial, Todd requested equal parenting time, while Kayla was not only opposed to this, she further asserted that Todd's parenting time should be decreased. In its order, the court found that the evidence was overwhelming that not only do the parties not get along with each other, they do not communicate with each other about parenting issues or child specific issues. Specifically, the court found that the samples of communication provided to it (copies of texts and emails) do not reflect the level or tone of communication necessary for the parties to share custody of the children. The court further concluded that the evidence supported a finding that Kayla had been the primary care provider, although Todd has been an attentive and supportive father, and has a good relationship with the children. The court went on to state, however, that the children seem to have done well under the temporary order and with the parenting time that they have had with each of the parties. Accordingly, the court found that increasing Todd's parenting time would not necessarily be in the children's interest as it would likely result in even more opportunities for the parties to "butt heads." The court also found that as a whole, there was insufficient evidence to

support Kayla's contention that reducing Todd's parenting time would be in the children's best interests.

Upon our de novo review of the record, we find that the court acted within its discretion in establishing a parenting time schedule similar to that contained in the temporary order, in addition to the extended period of parenting time with Todd in the summer and through the holiday schedule agreed to by the parties. The evidence at trial demonstrated that this arrangement had worked well for the children and the parties had generally been able to abide by the terms of the temporary order. We further agree with the district court that an increase in Todd's parenting time would be disruptive to the children and would likely exacerbate the communication problems between the parties to the detriment of the children.

We conclude that Todd's parenting schedule, when viewed in its entirety, provides a satisfactory basis for preserving and fostering the children's relationship with their father. Therefore, the schedule was reasonable and not an abuse of discretion.

For these reasons, this court will not disturb the parenting plan established by the January 23, 2014 order as amended in the May 13 order.

Todd's first assignment of error is without merit.

## 2. CHILD SUPPORT

Todd contends that the district court erred in calculating Kayla's income for the purpose of determining his child support obligation. Specifically, Todd alleged that the court failed to include Kayla's additional sources of income, beyond her employment earnings, in calculating child support. Todd also asserts that the court arbitrarily determined his gross monthly income for purposes of this calculation. Lastly, Todd argues that the court erred by failing to credit either party with any deduction for contributions to retirement as provided under the Nebraska Child Support Guidelines.

The paramount concern in child support cases is the best interests of the child. *Incontro v. Jacobs*, 277 Neb. 275, 761 N.W.2d 551 (2009). In general, child support payments should be set according to the Nebraska Child Support Guidelines adopted by the Nebraska Supreme Court, which are presumed to be in the best interests of the child. *Id*. See, also, Neb. Rev. Stat. § 42-364.16; *Anderson v. Anderson*, 290 Neb. 530, 861 N.W.2d 113 (2015). In determining the amount of a child support award, a trial court must consider the status, character, and situation of the parties and attendant circumstances, including the financial condition of the parties and the estimated cost of support of the children. *Anderson v. Anderson, supra*. Further, the Nebraska Child Support Guidelines provide that in calculating child support, a court must consider a party's total monthly income derived from all sources. Neb. Ct. R. § 4-204. See, also, *State on behalf of A.E. v. Buckhalter*, 273 Neb. 443, 730 N.W.2d 340 (2007).

Given our review of the record, we find that the court properly considered the total income of both parties from all sources in its calculation of child support.

First, the court properly considered Kayla's various sources of income in reaching a gross monthly income of $3,065. The court utilized her current monthly gross salary of $2,731.82 as of January 1, 2015, which amount accounted for Kayla no longer receiving a $480 health insurance reimbursement. The record shows that for the years 2011 and 2012, Kayla averaged $700 from the

hospital foundation for her fund-raising work, she received $550 in director fees in 2012, and she received $2,800 in dividends from Roth Agra in 2011 and 2012. The 2013 tax returns do not contain specific information regarding these sources of income. Averaging these three sources of income amounts to $337.50 per month, which when added to Kayla's employment income, is very close to the trial court's calculation of her total monthly income.

Todd's primary complaint is that the court failed to include Kayla's trust distributions as income. The record supports the conclusion that the trust income and distributions were properly excluded from the court's consideration. The 2013 income tax return reflects that the trust income reported was passive income or gain. As established by Oelkers, Kayla did not actually receive this income. Further, the $7,500 distribution made to Kayla in 2014 was for the purpose of the payment of taxes that Kayla incurred as a result of the 2013 capital gains resulting from trust income. There is no evidence in the record that Kayla received distributions from the trust for any other purpose. Therefore, the court did not err in excluding such distributions from its child support calculation.

Next, the court's decision to assign Todd a gross monthly income of $7,690 was not arbitrary. The district court indicated that because Todd's income was difficult to establish, his most recent paystub offered at trial should be extrapolated to determine his annual and monthly income. This resulted in the court's calculation of Todd's base salary of $6,522.10 per month. In looking at the paystub, the total gross income for the current pay period was $3,010.20, and based upon 26 pay periods in the year, results in annual earnings of $78,265.20, or $6,522.10 per month. Next, the court extrapolated and added the bonus income, as contained on Todd's pay stub, resulting in $1,167.92 additional income per month, for total monthly gross income of $7,690.02. Given Todd's testimony that he typically received an annual bonus (which the record suggests was approximately $13,000 in 2013 for the 2012 year), it was properly considered as a regular part of Todd's overall income and included in the court's child support calculation. See *Workman v. Workman*, 262 Neb. 373, 632 N.W.2d 286 (2001) (where party earns or can reasonably expect to earn a certain amount of income on a regular basis, a rebuttable presumption of including such income arises under the guidelines). We further find no abuse of discretion in the court's use of the current earnings for both parties, particularly in light of the increasing nature of both of their salaries. See *Peter v. Peter*, 262 Neb. 1017, 1025, 637 N.W.2d 865, 873 (2002) (it is not in the children's best interests to allow income averaging when a party's income is consistently increasing). See, also, *Bussell v. Bussell*, 21 Neb. App. 280, 298-299, 837 N.W.2d 840, 855-856 (2013).

Lastly, Todd asserts that the court erred in failing to include a deduction for retirement contributions from the child support calculation. The Nebraska Child Support Guidelines, § 4-205(C), allow as a deduction from income actual contributions to a retirement plan up to 4% of gross income for voluntary contributions. Although the parties did not testify regarding their current retirement account contributions, their pay stubs reflect such contributions. Kayla's paystubs, Exhibit 6, reflect deductions for "IRA." Todd's paystub, Exhibit 61, reflects a before tax voluntary deduction for "TDA", along with a "TDA match" deduction. This appears to relate to his 403(b) account with American United Life (Exhibit 17). The court's temporary child support calculation included retirement deductions for both parties. Although the omission of the

retirement deduction was raised by Todd in connection with his motion for new trial or to alter or amend, the court did not alter its child support calculation to include such deductions. We determine that this omission was error. We therefore remand the cause to the district court to determine the retirement contribution deduction to be allowed to each party and to recalculate the child support obligation accordingly, using the same income figures which we have determined above were not in error.

### 3. ALIMONY

Todd argues that the term and amount of alimony awarded to Kayla is unreasonable, and the court erred in calculating the parties' income for the purposes of determining alimony. As in the last assignment of error, Todd alleged that the court failed to include Kayla's sources of income beyond her salary in determining alimony. Additionally, Todd argues that alimony was unreasonable and inconsistent with Nebraska law because "both parties are working and are able to provide for themselves, neither party needs alimony to bridge a period of time while working to support him or herself, and the factors required to be considered and weighed in Neb. Rev. Stat. § 42-365 do not support an award of alimony."

In dividing property and considering alimony upon a dissolution of marriage, a court should consider four factors: (1) the circumstances of the parties, (2) the duration of the marriage, (3) the history of contributions to the marriage, and (4) the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of each party. *Anderson v. Anderson*, 290 Neb. 530, 861 N.W.2d 113 (2015). In addition to the specific criteria listed in Neb. Rev. Stat. § 42-365 (Reissue 2008), in dividing property and considering alimony upon a dissolution of marriage, a court should consider the income and earning capacity of each party and the general equities of the situation. *Anderson, supra*.

A party's alimony obligation is to be set according to the income he or she has available after his or her child support obligations, if any, have been accounted for. *Gress v. Gress*, 274 Neb. 686, 743 N.W.2d 67 (2007). Alimony is not a tool to equalize the parties' income, but a disparity of income or potential income might partially justify an alimony award. *Anderson, supra*.

In entering a decree awarding alimony, the court may take into account all of the property owned by the parties at the time of entering the decree, whether accumulated by their joint efforts or acquired by inheritance, and make such award as is proper under all the circumstances disclosed by the record. *Bauerle v. Bauerle*, 263 Neb. 881, 644 N.W.2d 128 (2002).

In reviewing an alimony award, an appellate court does not determine whether it would have awarded the same amount of alimony as did the trial court, but whether the trial court's award is untenable such as to deprive a party of a substantial right or just result. *Anderson, supra*. See, also, *Bauerle, supra* (appellate court is not inclined to disturb trial court's award of alimony unless it is patently unfair on the record). The primary purpose of alimony is to assist an ex-spouse for a period of time necessary for that individual to secure his or her own means of support. *Anderson, supra*. In determining whether alimony should be awarded, in what amount, and over what period of time, the ultimate criterion is one of reasonableness. *Sitz v. Sitz*, 275 Neb. 832, 749 N.W.2d 470 (2008). See, also, *Anderson, supra*; *Bauerle, supra* (in considering specific criteria of Neb. Rev.

Stat. § 42-365 concerning an award of alimony, a court's polestar must be fairness and reasonableness as determined by the facts of each case).

Upon our review, we find that the district court did not abuse its discretion in awarding Kayla alimony of $500 per month for 24 months, or until $12,000 is paid.

First, for the same reasons discussed in the previous section, the court did not abuse its discretion in determining that Kayla's monthly income totals $3,065 per month.

Regarding the award of alimony, such an amount and duration was fair and reasonable considering the circumstances in this case. First, the marriage was of relatively long duration (21 years), supporting an award of alimony. See *Bauerle v. Bauerle*, 263 Neb. 881, 889, 644 N.W.2d 128, 135 (2002) (in awarding alimony, court found marriage of approximately 20 years to be of long duration). Second, a clear disparity of income existed in this case, with Todd's monthly income being more than twice that of Kayla's. Third, evidence presented at trial indicated that Kayla's expenses following the separation exceeded her income. Lastly, the circumstances and general equities of the situation, particularly Kayla's role as the children's primary caretaker, supported the award of alimony. The record indicates that during the marriage Todd was the primary breadwinner for the family, with Kayla being mainly responsible for child care. Following the separation, Kayla had to go through the expensive process of relocating herself and her children to a new home. Kayla testified to having had to borrow money from her mother in order to cover daily expenses, moving costs, and for attorney fees.

Considering the amount and duration of the alimony award in light of the circumstances of this case, we find no abuse of discretion. The amount was in no way punitive and does not deprive Todd of a substantial right or just result. The award was reasonable and will provide appropriate assistance to Kayla for a period of time necessary for her to secure her own means of support.

Todd's third assignment of error is without merit.

### 4. PROPERTY DIVISION

On appeal, Todd alleges that the district court erred by failing to include Kayla's Edward Jones retirement account ending in 617 in its property division calculation as a marital asset. Todd argues that Kayla did not satisfy her burden to prove that the account was a nonmarital asset. Specifically, Todd asserts that Kayla failed to demonstrate that no additional contributions were made to the account during the marriage. As a result, Todd requests that the account be labeled as marital, included in the net marital estate, and divided equally between the parties.

Under Neb. Rev. Stat. § 42-365 (Reissue 2008), the equitable division of property is a three-step process. The first step is to classify the parties' property as marital or nonmarital, setting aside the nonmarital property to the party who brought that property to the marriage. The second step is to value the marital assets and marital liabilities of the parties. The third step is to calculate and divide the net marital estate between the parties in accordance with the principles contained in § 42-365. *Despain v. Despain*, 290 Neb. 32, 858 N.W.2d 566 (2015). Neb. Rev. Stat. § 42-365 (Reissue 2008) authorizes a trial court to equitably distribute the marital estate according to what is fair and reasonable under the circumstances. *Bock v. Dalbey*, 283 Neb. 994, 815 N.W.2d 530 (2012). This assignment of error centers on step one of the equitable division process.

Property which one party brings into the marriage is generally excluded from the marital estate. *Gress v. Gress*, 271 Neb. 122, 710 N.W.2d 318 (2006). The marital estate includes property accumulated and acquired during the marriage through the joint efforts of the parties. *Tyma v. Tyma*, 263 Neb. 873, 644 N.W.2d 139 (2002). With some exceptions, the marital estate does not include property acquired by one of the parties through gift or inheritance. *Heald v. Heald*, 259 Neb. 604, 611 N.W.2d 598 (2000).

As correctly noted by Todd, the burden of proof to show that property is nonmarital remains with the person making the claim in a dissolution proceeding. *Gress v. Gress*, 271 Neb. 122, 710 N.W.2d 318 (2006).

Upon our review of the record, we find that Kayla satisfied her burden of proof. The account has been held solely in Kayla's name from its inception in 1987. It was initially funded by her parents as a gift, long before her marriage to Todd. Kayla testified that she never made contributions to the account at any time, including during the marriage. The testimony of Roth generally corroborated these points. There was no evidence presented that marital funds had been commingled with the account at any point. Todd admittedly had no knowledge or evidence that contributions to the account had been made during the marriage.

Kayla successfully satisfied her burden of demonstrating that the account was a nonmarital asset. Therefore, the court did not abuse its discretion in excluding the account from the marital estate.

Todd's fourth assignment of error is without merit.

## 5. PROPERTY EQUALIZATION PAYMENT

Todd asserts that the district court erred by ordering him to pay the property equalization payment of $112,137 "forthwith" rather than through a Qualified Domestic Relations Order (QDRO). At trial, Todd suggested that the equalization payment (which Todd proposed should be $58,113) be made from his retirement account by a QDRO. Todd argues that the only asset available to promptly satisfy the payment is his retirement account, which the court valued at $219,516, and that forcing him to withdraw funds from his retirement account was an abuse of discretion by the court. Todd further emphasizes that a QDRO would not disadvantage either party because Kayla did not show an immediate need for the cash, and neither party would face tax consequences or penalties. Lastly, Todd claims that no evidence was offered regarding the tax implications of withdrawing funds from the retirement account because "it is common sense that a non-taxable transfer should occur in a case such as this."

Neb. Rev. Stat. § 42-365 authorizes a trial court to equitably distribute the marital estate according to what is fair and reasonable under the circumstances. *Bock v. Dalbey*, 283 Neb. 994, 815 N.W.2d 530 (2012). A QDRO, generally speaking, is simply an enforcement device of the decree of dissolution. *Blaine v. Blaine*, 275 Neb. 87, 92, 744 N.W.2d 444, 448 (2008). A QDRO implements a trial court's decision of how a pension is to be divided incident to divorce or dissolution. *Thompson v. Thompson*, 18 Neb. App. 478, 785 N.W.2d 159 (2010). Stated another way, a QDRO provides a means of an alternate payee, in this case a former spouse, to receive payments from another's retirement account. Black's Law Dictionary 1360 (9th ed. 2011).

In the present case, the court did not divide the retirement accounts; rather it awarded each party his or her own accounts, divided the remaining assets and debts, and then awarded Kayla an equalization judgment. However, it is clear that the only liquid assets awarded to Todd of sufficient value from which to satisfy the equalization payment "forthwith" are his retirement account of $219,516 and his annuity of $35,325. While Todd was awarded the marital home, the amounts of the first and second mortgage nearly total its value, leaving no equity. His remaining personal property, including his vehicle, boats, and other property, have a total value of approximately $55,000.

We conclude, on this record, that the district court abused its discretion in ordering that an equalization payment of $112,137 be made "forthwith." We conclude that under the circumstances of this case, awarding Kayla this sum from Todd's retirement account using a QDRO was a more appropriate manner to equalize the division of the marital estate.

Thus, we reverse the district court's order that Todd pay Kayla an equalization payment of $112,137 "forthwith" and remand the cause to the district court with directions to order that this payment be made from Todd's retirement account pursuant to a QDRO. The remaining division of assets and debts is affirmed.

## VI. CONCLUSION

Upon our de novo review, we find that the district court did not abuse its discretion in its award of parenting time, its determination of the parties' income, and its award of alimony. The court did err in failing to include a deduction from income for the parties' retirement contributions, and we remand the cause to the district court for recalculation of child support with these deductions. Further, the court erred in awarding Kayla an equalization payment of $112,137 "forthwith" rather than utilizing a QDRO division of Todd's retirement account. All other aspects of the property and debt division are affirmed.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED WITH DIRECTIONS.