IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

HOVEY V. HOVEY

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

MICHAEL A. HOVEY, APPELLANT,

V.

DAWN N. HOVEY, APPELLEE.

Filed May 16, 2017.    No. A-15-1143.

Appeal from the District Court for Douglas County: SHELLY R. STRATMAN, Judge. Affirmed in part, affirmed in part as modified, and in part reversed.

Matthew Stuart Higgins and, on brief, Brandie M. Fowler, of Higgins Law, for appellant.

Richard P. McGowan, of McGowan Law Firm, P.C., L.L.O., for appellee.

PIRTLE, BISHOP, and ARTERBURN, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Michael A. Hovey appeals from the property division and alimony portions of the decree of the district court for Douglas County dissolving his marriage to Dawn N. Hovey. Michael argues that although the court stated two dates from which it would value the parties' assets, it erred when it failed to use the dates it announced, resulting in incorrect valuations. He also argues that the trial court included certain nonmarital assets in the division of marital assets, as well as set aside some assets as nonmarital which should have been considered marital. Finally, Michael argues that the alimony award was erroneous, both in terms of amount and duration.

For the reasons set forth below, we find that the district court abused its discretion when it failed to set aside Michael's nonmarital portion of the Fidelity Destiny account, and we modify the district court's amended decree accordingly. We also find that the district court abused its

- 1 -

discretion when it set aside $88,000 in inheritance and child support monies as Dawn's nonmarital property, and we reverse that portion of the district court's amended decree. We further find that the district court abused its discretion in using valuation dates inconsistent with its stated valuation dates for some of the parties' investment, retirement, and bank accounts, resulting in incorrect valuations; we were able to determine the correct values for the accounts as set forth later in this opinion and we modify the amended decree accordingly. Finally, we find that the district court's award of alimony to Dawn was not an abuse of discretion and it is affirmed.

## II. BACKGROUND

Michael and Dawn were married in June 2000. They have two children who were born during the marriage, and Dawn also has another child from a previous relationship. Michael filed a complaint for dissolution of marriage on July 1, 2011, and Dawn filed a counterclaim in August which included a request for spousal support. The parties physically separated on November 12, when Dawn moved out of the marital home pursuant to a court order.

Numerous motions were filed, and hearings held, throughout the proceedings, but we limit our discussion to those that are relevant and necessary to this appeal.

Both parties filed motions for temporary relief, and a hearing was held on September 21, 2011. In its temporary order filed on November 15, the district court awarded temporary legal and physical custody of the parties' two children to Michael, subject to Dawn's parenting time every other weekend and one evening per week. Michael was also awarded possession of the marital residence, and Dawn was to be excluded from the residence after November 12. Dawn's motion for spousal support, and Michael's motion for child support, were reserved until a later hearing. After further hearing in December, the district court entered an order on March 5, 2012, ordering Michael to pay Dawn alimony of $300 per month beginning on January 1; the order noted that Michael's motion for child support had been withdrawn.

A 3-day trial was held in June 2013. Michael (age 43) and Dawn (age 42) both testified, and nearly 200 exhibits were received into evidence. Other witnesses testified to issues not relevant on appeal. At the conclusion of the trial, the court left the record open "by stipulation" to, in part, allow time to determine if there were outstanding bank accounts of the parties.

The district court's decree was filed on May 7, 2014. But an amended decree was subsequently filed on November 6, 2015. The amended decree recounted that after the court allowed the record to remain open at the end of trial in June 2013, various motions were filed by both parties and hearings were held which caused delays, especially when the parties could not agree on language to be included in various orders. After the district court entered its decree in May 2014, Dawn filed a motion for new trial, and Michael filed motions to vacate the decree, for a new trial, for orders clarifying rulings on prior motions, and for a final order. On August 19, a hearing was held wherein the court denied the motion to vacate the decree and the motion for new trial. The court ordered Dawn's counsel to prepare a revised decree reflecting clarifications made on the record (we note that 10 additional exhibits were received at this hearing related to the parties' financial accounts). Between August 2014 and November 2015 (when the amended decree was filed), there was more back-and-forth, multiple proposed decrees, and more factual findings.

In its amended decree, the district court dissolved the parties' marriage. The parties were awarded joint legal and physical custody of their two minor children, with parenting time to alternate weekly. Michael was ordered to pay monthly child support of $1,675 commencing May 1, 2014. Michael was also ordered to pay Dawn alimony in the amount of $2,000 per month for 84 months, commencing May 1 and continuing thereafter or until the death of either party, Dawn's remarriage, or further order of the court, whichever occurs first. Each party was ordered to pay their own attorney fees and costs.

The district court also distributed the parties' marital estate, after identifying and setting aside nonmarital property. We now summarize the court's division of assets, and we will discuss the specific assets and accounts at issue on appeal later in this opinion. Michael was awarded the marital residence; the home had $135,283 in marital equity at the time of separation, and Michael was ordered to pay Dawn an equalization payment for half that amount ($67,641.50). Michael was awarded a 2005 GMC Yukon, 2006 Harley Davidson Road Glide motorcycle, 2004 Polaris Predator 50 Four-Wheeler, 2004 Polaris Predator 90 Four-Wheeler, and a 2003 Lund fishing boat and trailer; the total value for these items was $30,229. Dawn was awarded a 2010 Honda Odyssey and 2010 Honda Civic; the total value for these items was $32,723. The district court also divided the parties' investment accounts and bank accounts, which we discuss more fully below. The parties had no marital debts, and each party was to be responsible for any debts incurred in their name since the filing of the complaint on July 1, 2011.

The district court found that the parties' investment, retirement, and bank accounts would be "divided equally" and valued as of July 1, 2011 (the date Michael filed for divorce), but if the evidence was insufficient to determine value as of July 1, then the court would assign value as of November 12 (the date of physical separation). The court stated "[t]he parties shall each be awarded any gains or losses on their one-half portion of the accounts since time of separation to time of division." And "any contributions made to these accounts since the time of separation are awarded to the contributing party." The court valued twelve investment and retirement accounts at a total of $823,698. However, $12,843 of one of the accounts was set off as Michael's premarital property. Accordingly, the marital portion of the twelve investment and retirement accounts was valued at $810,855.

As for the bank accounts, the court awarded five accounts to Michael and four accounts to Dawn. One of Dawn's accounts was originally valued at $111,023, but the district court determined that $50,000 of that amount was inheritance money Dawn received from family, and $38,000 was child support paid for Dawn's daughter (by that child's father); thus, $88,000 was set off to Dawn as nonmarital property. Accordingly, the court determined that the marital portion of the five accounts awarded to Michael was valued at a total of $18,779, and the marital portion of the four accounts awarded to Dawn was valued at a total of $31,863; and Dawn was ordered to pay Michael an equalization payment of $6,542.

Michael appeals from the district court's amended decree.

### III. ASSIGNMENTS OF ERROR

Reordered and restated, Michael assigns that the district court erred in: (1) dividing the marital estate by (a) including certain nonmarital assets belonging to Michael in its division of

marital assets, (b) excluding certain monies it determined were inherited and/or nonmarital, despite Dawn's failure to fully trace the monies, (c) miscalculating the value of Dawn's vehicles, and (d) erroneously valuing various accounts held by the parties; and (2) awarding alimony to Dawn.

## IV. STANDARD OF REVIEW

In actions for dissolution of marriage, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Lorenzen v. Lorenzen*, 294 Neb. 204, 883 N.W.2d 292 (2016). This standard of review applies to the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees. *Id*.

## V. ANALYSIS

### 1. DIVISION OF MARITAL ESTATE

In a divorce action, the purpose of a property division is to distribute the marital assets equitably between the parties. *Stanosheck v. Jeanette*, 294 Neb. 138, 881 N.W.2d 599 (2016). Equitable property division under Neb. Rev. Stat. § 42-365 (Reissue 2016) is a three-step process. *Stanosheck, supra*. The first step is to classify the parties' property as marital or nonmarital. *Id*. The second step is to value the marital assets and marital liabilities of the parties. *Id*. The third step is to calculate and divide the net marital estate between the parties. *Id*. The ultimate test in determining the appropriateness of a property division is fairness and reasonableness as determined by the facts of each case. *Id*. See, also, *Liming v. Liming*, 272 Neb. 534, 547, 723 N.W.2d 89, 99 (2006) ("Although the division of property is not subject to a precise mathematical formula, the general rule is to award a spouse one-third to one-half of the marital estate, the polestar being fairness and reasonableness as determined by the facts of each case.").

The date on which a court values the marital estate should be rationally related to the property composing the marital estate. *Brozek v. Brozek*, 292 Neb. 681, 874 N.W.2d 17 (2016).

Generally, all property accumulated and acquired by either spouse during a marriage is part of the marital estate. *Brozek, supra*. Exceptions include property that a spouse acquired before the marriage, or by gift or inheritance. *Id*. Setting aside nonmarital property is simple if the spouse possesses the original asset, but can be problematic if the original asset no longer exists. *Id*. Separate property becomes marital property by commingling if it is inextricably mixed with marital property or with the separate property of the other spouse. *Id*. If the separate property remains segregated or is traceable into its product, commingling does not occur. *Id*. The burden of proof rests with the party claiming that property is nonmarital. *Id*.

(a) Did Michael Have Nonmarital Assets Included in Marital Estate?

Michael argues that the district court erroneously included certain nonmarital assets belonging to him in its division of marital assets. We discuss each challenged asset in turn.

*(i) Four-Wheelers*

Michael claims he acquired the two Polaris four-wheelers awarded to him in the amended decree after the date of separation of the parties and therefore, they should have been classified as

nonmarital property and excluded from the marital estate. Dawn argues that Michael's brief does not cite to specific, undisputed evidence as to when the four-wheelers were purchased, or with what funds they were purchased.

At trial, Michael provided evidence of the blue book valuations for the two four-wheelers, showing that they have a total value of $1,965. However, there was no testimony or other documentary evidence (e.g. a receipt) specifically showing when he purchased the four-wheelers, and with what funds. Exhibit 122 (Michael's summary of all automobile valuations) simply states below each four-wheeler: "Purchased Post-Separation." This is not sufficient evidence to meet Michael's burden to prove that the four-wheelers should be considered nonmarital property.

*(ii) TD Ameritrade Account #xxx-xx9803 (#9803)*

Michael argues that the district court properly excluded from the marital estate his premarital interest ($12,843) in TD Ameritrade account #9803 (total value by court was $40,947), but failed to exclude any gains or losses on that premarital interest. He argues the result is "incorrect and invalid": "It is invalid because it does not follow from the Court's findings regarding gains and losses generally. It is incorrect because it improperly awards Dawn assets which should be excluded from the marital estate pursuant to *Van Newkirk v. Van Newkirk*, 212 Neb. 730, 325 N.W.2d 832 (1982)." Brief for appellant at 18. *Van Newkirk* provides that when nonmarital property increases in value, and the increase was due principally to inflation and not to any significant efforts by the spouse, then the appreciation should not be included in the marital estate.

Dawn disagrees with Michael's argument that he is entitled to the gains and losses on his premarital interest. She notes that Michael does not cite to a specific exhibit in his brief, nor does he provide any specific argument as to how much he should be given credit for above the $12,843 granted by the district court. She further claims that Michael should not have been given a credit for the premarital amount of $12,843 because he failed to trace the funds in the account from before the marriage to the date of valuation; however, Dawn did not file a cross-appeal on this or any other issue decided by the district court. Dawn argues that "a close reading of the statements provided to the Court [exhibits 63 and 64] make clear that [Michael] failed to show that any gains in the account should be pre[]marital property, or that the premarital funds of $12,843 were even still in the account." Brief for appellee at 7.

The district court valued TD Ameritrade account #9803 at $40,947, but then excluded $12,843 as Michael's premarital interest. Although Michael claims that any gains or losses on the premarital amount should also be excluded from the marital estate, he testified that "it's hard to figure out gains from the original amount" in the account at the time of the marriage. And he admits that the account has marital monies. Michael did not hire an actuary, accountant, or other expert to figure out the gains or losses because he was "not interested." We note that exhibit 64 is an account statement for the period of "05/27/00-06/30/00" showing a total value of $12,843, and exhibit 63 contains account statements covering June 1 to August 31, 2011. There are no account statements showing what activity occurred from July 1, 2000, to May 31, 2011, essentially the duration of the marriage. Accordingly, we find that Michael did not meet his burden of proof regarding what gains and/or losses on the premarital amount should be set aside as nonmarital. See

*Brozek, supra* (separate property becomes marital property by commingling if inextricably mixed with marital property; burden of proof rests with party claiming property nonmarital).

*(iii) Fidelity Destiny #xxxxxx1454-7 (#1454-7)*

The district court found that no premarital determination could be made from exhibit 58 regarding Fidelity Destiny account #1454-7. However, unlike the TD Ameritrade account just discussed, exhibit 58 contains a complete history of the Fidelity Destiny account from its inception on July 21, 1999, through December 2011, and we conclude a premarital value can be determined. A separate document contained in the exhibit indicates an account value of $8,540.05 as of May 15, 2013, and since that value (less five cents) in the amended decree was not challenged, we leave that value in place (as seen in our summary table below), and simply apply the determined premarital percentage accordingly. Before getting to the mathematics of our determination, we point out that in fairness to the district court in reaching its decision as to this particular account, neither Michael's testimony nor his counsel's explanation about the account adequately represented the contents of that document. This court strongly cautions against parties offering financial documents in bulk without providing detailed explanations as to what can be extrapolated from those documents. Parties are discouraged from leaving a court to extrapolate and perform its own mathematics with such documents, and are cautioned that on appellate review, it may not always be an abuse of discretion warranting modification or reversal if a trial court is not provided more direction with regard to the specific information the court is being asked to consider.

Michael contends that exhibit 58 "speaks directly to the Fidelity account," and shows the account value as of May 6, 2013, was 665.113 shares worth $8,540.05, and that the historical statements predating the marriage demonstrate a monetary value of no less than $2,479.91 for the 2000 tax year. Brief for appellant at 19. He claims that with this evidence, he met his burden of establishing a monetary value for his premarital interest in this account. He concludes that "[t]he gross amount of the purchases made by [him] prior to June 3, 2000, the date of the marriage of the parties, totaled $2,774.00," therefore, that amount "as well as any gains or losses on that amount," should have been nonmarital property. *Id.* Michael did not, however, provide to the district court any proposal or guidance as to how the court could calculate such gains or losses, especially given that exhibit 58 reflects several post-marriage purchases of additional shares.

Dawn argues that although Michael contends that the historical statements predating the marriage demonstrate a monetary value of no less than $2,479.91 for the 2000 tax year, "this value is actually found on a statement dated June 21, 2001." Brief for appellee at 8. And she states the last page of exhibit 58 reflects purchases made prior to the date of the marriage, but it contains contradictory information that does not "add up." Brief for appellee at 8. "For example, July 21, 1999 contains two purchases, each for $1200 with purchase price of $15.82 per share, but one purchased 37.927 shares and one purchased 75.853 shares." *Id.* Accordingly, Dawn argues that Michael failed to provide credible evidence of the Fidelity Destiny account's actual value prior to the marriage, and any gains or losses on that amount during the marriage. Although the mathematical inconsistency pointed out by Dawn does exist on that last page, the total number of shares acquired in 1999 as reflected on that last page is consistent with the "2000 Transcript (Contractual)" (exhibit 58, page 21). That document clearly shows 125.1740 shares owned at the

beginning of 2000, and those shares can be attributed solely to Michael as being owned prior to the marriage.

Exhibit 58 shows that Michael actually owned 138.597 shares as of May 30, 2000. Those shares were acquired by cash investments of $2,400 on July 21, 1999 (113.78 shares), plus the reinvestment of dividends and gains on December 10 (11.394 shares), and another cash investment of $200 on May 30, 2000 (13.423 shares). After the parties' marriage in June 2000, a cash investment of $200 was made on August 22 (12.376 shares), another cash investment of $400 was made on November 30 (28.612 shares), and on December 15, gains were reinvested to acquire more shares (26.217). Pages 21 and 22 of exhibit 58 confirm these numbers. The document titled "2000 Transcript (Contractual)" is dated June 21, 2001, and shows beginning shares of 125.174, which accounts for all activity by the end of 1999. The document then shows all activity in the account for the year 2000. This includes the $200 premarital investment on May 30, plus the postmarital investments of $200 on August 22 and $400 on November 30, and the reinvestment of $323.25 from the total capital gains earned that year (26.217 shares). Without considering the acquisition of the 26.217 shares from reinvesting the capital gains, the total premarital shares owned by Michael at the end of 2000 was 138.597 shares which were acquired with $2,600 in premarital funds. The total marital shares by the end of 2000 was 40.988 shares which were acquired by $600 in marital funds. Therefore, by the end of 2000, of the $3,200 cash invested into this account, 81.25 percent can be allocated to Michael as premarital, and 18.75 percent to the marriage. Splitting the reinvestment of the capital gains based on those percentages results in the premarital portion acquiring another 21.3013 shares, and the marital portion acquiring another 4.9157 shares. The shares as of the end of 2000 totaled 159.8983 premarital (77.7 percent) and 45.9037 marital (22.3 percent). The total of these shares equals 205.802, which is exactly the number of shares reflected as the beginning balance on page 20 of exhibit 58, entitled "2001 Transcript Contractual."

For the year 2001, $500 cash was invested for another 50.05 marital shares, and income of $5.12 was reinvested for .4820 shares. For the year 2002, $1,500 cash was invested for another 162.534 marital shares, and income of $9.24 was reinvested for another 1.019 shares. For the year 2003, only income of $4.20 was reinvested for .4050 shares. For the year 2004, $1,000 cash was invested for another 91.241 marital shares, and income of $48.62 was reinvested for 4.244 shares. For the years 2005 and 2006, only gains and income were reinvested for another 10.427 shares and 36.093 shares respectively. By the end of 2006, after splitting the new shares acquired by gains and income based on percentage of shares owned (premarital versus marital) each year, the total number of premarital shares was 177.364 (31.54 percent) and the total number of marital shares was 384.933 (68.46 percent). No further marital investments were made to the account through 2011, simply reinvestments of income and gains, so the percentage allocated between premarital and marital remains unchanged in subsequent years.

Therefore, based on the continuity of information provided in exhibit 58, we conclude that Michael's premarital portion of this account is 31.54 percent. The marital portion is 68.46 percent, which should be divided equally between the parties. Using the unchallenged account value of $8,540, we conclude that Michael's premarital portion of this account equals $2,693.52.

Since exhibit 58 does allow for the tracing of Michael's premarital investment in this account as separated from the marital investments in the account, we conclude that Michael met his burden of proof on this asset. We modify the amended decree accordingly.

### (b) Were Marital Monies Set Aside as Dawn's Nonmarital Property?

Michael argues that the district court erroneously excluded certain monies it determined were inherited and/or nonmarital, despite Dawn's failure to fully trace the monies.

### (i) $88,000 Set-Off

The district court determined that $88,000 of the funds in USAA Savings Account #xxxxx-x238-9 (#2389) (awarded to Dawn) was nonmarital property, and thus subtracted that amount when determining the marital value of the account. In setting aside the $88,000, the court found that $50,000 was inheritance money that Dawn received from family, and $38,000 was child support paid for Dawn's daughter from a previous relationship.

Michael testified at trial that in 2009, Dawn took more than $88,000 from their joint savings account (he did not give an account number), and put it into an account in her and her daughter's name (USAA Savings Account #2389). He testified that he noticed the missing funds when he was doing the parties' banking and thought they might have been victims of identity theft. When Michael mentioned the missing money to Dawn she said she took it because her parents gave them money from her grandparents, and she thought her daughter should get all of her child support back for the past 10 years. According to Michael, both money sources (the inheritance and the child support for Dawn's daughter) had originally been deposited into the marital USAA savings account and comingled with marital funds.

Dawn testified that she withdrew $88,682 from the parties' USAA Savings Account #xxxxx-1073-8 (#1073-8) in 2009 to recapture the inheritance and "three quarters" of her daughter's child support over 10 years (exhibit 50, page 26, shows an internet withdrawal occurred on May 15).

Michael states that the evidence presented at trial shows only that Dawn opened USAA Savings Account #2389 in 2009 naming herself and her daughter as account holders. Exhibit 212, page 36, shows an "internet deposit" into the account in the amount of $88,682 on May 15, and an additional transfer on that day from another USAA account in the amount of $10,000. He claims there was no additional information given with regard to the origin of these funds, and no bank records are presented from any other USAA account held by the parties for the year 2009. Therefore, Michael argues that Dawn presented insufficient evidence of the inheritance and child support to justify the nonmarital set-off.

### a. $50,000 Inheritance

Dawn argues that Michael acknowledged that she received a $50,000 inheritance in 2009, deposited it into a joint account, and then separated it that same year into another account with her daughter's name on it. Dawn argues that Michael "cites to no law that requires [her] inheritance . . . to be included in the marital estate, particularly when such funds had been removed from the joint account two years prior to the filing for divorce." Brief for appellee at 12.

At trial, Michael acknowledged that Dawn was gifted a one-time lump sum of $50,000 from her grandparents, and that "[h]er dad wrote the check because [h]e was the executor of their estate and their power of attorney." The record reflects that on cross-examination, Michael was shown a cancelled check to "refresh [his] recollection" and agreed that the check dated January 9, 2009, was written to Dawn, and said "inheritance" in the memo portion; the check was not offered or received into evidence. He testified that the money was deposited into the parties' joint USAA savings account and the money was "co[]mingled in our joint account for a period of time when there was money coming and going from both of us in addition to any other money that was in there." When asked if there was "any way to figure out where the 50,000 went, was spent, not spent, how much of it?" Michael responded "no." According to Michael, any money the parties had was deposited into the joint savings account, and then money would be transferred out of the savings account and into a checking account whenever bills needed to be paid. Money transferred in and out of the joint savings account "[e]very couple weeks at least."

At trial, Dawn testified that she withdrew $88,682 from the parties' USAA Savings account #1073-8 in May 2009 to recapture the inheritance and "three quarters" of her daughter's child support over 10 years, and put the funds in her and her daughter's name. It was Dawn's position that the funds were not marital. She told Michael what she did and he never demanded that she return the funds.

Exhibit 50 contains the statements for account #1073-8 from June 2008 to December 2012. This is the account from which Dawn took $88,682 on May 15, 2009. However, the account statements do not show that a $50,000 deposit was ever made into account #1073-8. Based on our de novo review of the record, including the parties' testimony and the exhibits, we find that Dawn has not met her burden of proving that her inheritance should be set aside as nonmarital. Although property inherited by a spouse is an exception to the general rule that all property accumulated and acquired by either spouse during a marriage is part of the marital estate, the issue becomes problematic if the original asset no longer exists. See *Brozek v. Brozek*, 292 Neb. 681, 874 N.W.2d 17 (2016). Separate property becomes marital property by commingling if it is inextricably mixed with marital property or with the separate property of the other spouse. *Id*. If the separate property remains segregated or is traceable into its product, commingling does not occur. *Id*. The burden of proof rests with the party claiming that property is nonmarital. *Id*. The testimony presented at trial was that Dawn's inheritance money was comingled in the parties' joint savings account, during a time when money was going in and out of the account on a regular basis. Dawn did not provide any evidence tracing the funds withdrawn from the joint account (and placed into a separate account in her and her daughter's name) to her inheritance; a burden that was hers to prove.

At the August 19, 2014, hearing of the parties' motions for new trial, the district court stated "there was specific testimony by Dr. Hovey that he was not seeking to recoup any of that inheritance money." However, our review of the record does not reveal such testimony by Michael. There was a question posed during cross-examination when Michael was asked about his deposition testimony (his deposition was not offered or received into evidence) wherein he responded "I don't care" when asked if he was saying "the $50,000 should be considered a marital asset and that [he's] entitled to half of it?" Michael's statement hardly qualifies as specific testimony that he was not seeking to recoup the funds which Dawn claimed were nonmarital, i.e.,

the inheritance money. The court further found that "this was a situation that occurred two years prior to the filing of the complaint for dissolution, and that's why it was not included or divided at that time." Michael challenges the court's suggestion that he somehow acquiesced to Dawn transferring the funds, noting that he testified that he always considered the funds to be part of the marital estate. Although Michael said he "[didn't] care" if the funds were considered marital, the law says that separate property must be traceable into its product. *Brozek, supra*. And as Michael correctly points out, it was not his burden to prove the funds were marital. Instead, it was Dawn's burden "to prove the source of the funds; to trace those funds back to their origin account; to demonstrate that they were not co[]mingled; and to show that she is entitled to set-off of the inheritance." Brief for appellant at 26. There was testimony that Dawn received a $50,000 inheritance and that the money was deposited into a joint account of the parties. However, there is no documentary evidence showing into which account that $50,000 was deposited. And the bank records in evidence clearly show that the inheritance money was not deposited into the account from which Dawn subsequently withdrew $88,000. Furthermore, there was no evidence to show that the inheritance money still existed at the time of her withdrawal, or if it had otherwise already been spent by the parties. Accordingly, Dawn failed to trace her withdrawal to her inheritance.

Our de novo review of the record does not show that Michael acquiesced to Dawn transferring the funds into a separate account nor does the record show that he was not seeking to recoup the funds. To the contrary, Michael testified that he thought the funds should be marital, as they were comingled with marital funds in the parties' joint savings account and there was no way to tell where the specific inheritance funds went. For the reasons stated above, we agree with Michael that Dawn did not prove that she was entitled to a set-off of the inheritance. Accordingly, the $50,000 should not have been set aside as Dawn's nonmarital property. We reverse that portion of the district court's amended decree finding otherwise.

b. $38,000 Child Support

Michael argues that Dawn purportedly removed $38,000 from a marital account and segregated it to an account in her name, and in her daughter's name, in 2009 because it was child support money she received from her ex-husband. However, Michael claims that Dawn did not meet her burden of proving that the money was nonmarital because she did not offer a child support payment history or any other documentary evidence regarding the payment of support money, and in what amount and for that specific period of time.

As stated previously, Dawn testified that she withdrew $88,682 from the parties' USAA Savings account #1073-8 in 2009 to recapture the inheritance and "three quarters" of her daughter's child support over 10 years. Because the inheritance was $50,000, $38,682 of the withdrawal can be attributed to the child support; however, the district court only set aside $38,000 of this amount as nonmarital. Again, Dawn argues that Michael "cites to no law that requires [her]. . . child support from a prior marriage to be included in the marital estate, particularly when such funds had been removed from the joint account two years prior to the filing for divorce." Brief for appellee at 12.

Michael is correct that Dawn failed to meet her burden of proving that the money was nonmarital. Exhibit 50 contains the statements for account #1073-8 from June 2008 to December

2012. The statements do show child support deposits of $214.90 every two weeks from June 2008 to June 2009. Therefore, the statements reflect child support deposits for approximately a 1-year period before Dawn made the withdrawal, but the deposits made during that period certainly did not add up to $38,000. There was no documentary evidence regarding child support deposits prior to June 2008. The testimony at trial was that up until May 2009, the child support for Dawn's daughter was deposited into the parties' joint savings account and comingled with marital funds; the same joint account from which money transferred in and out "[e]very couple weeks at least." Michael argues that if, for some reason, Dawn is allowed to segregate the child support money, he should be entitled to a credit for all of the money he spent supporting Dawn's daughter from a previous marriage. However, we need not address Michael's argument because even assuming that the child support Dawn received from her ex-husband for her daughter was not spent on her daughter's care during the parties' marriage, Dawn has failed to trace the $38,682 withdrawal to the child support received from her ex-husband. See *Brozek v. Brozek, supra* (separate property becomes marital property by commingling if inextricably mixed with marital property; burden of proof rests with party claiming property nonmarital). Accordingly, the $38,000 should not have been set aside as nonmarital property. We reverse that portion of the district court's amended decree finding otherwise.

### (ii) USAA Coverdell Account #3927

In its amended decree, the district court awarded the "USAA Coverdell Brokerage Plan ending in #3927" to Dawn as separate from the marital estate. This account is an educational savings account in the names of Dawn and her daughter; technically "Dawn N[.] Hovey FBO [her daughter]." Exhibit 55, which was received without objection at trial, is one page from the 2012 annual account statement showing the account value was $11,019.42 on December 31, 2011, and $12,585.38 on December 31, 2012. Michael testified that the monies in that account were accumulated over the course of the parties' marriage, prior to their separation. He argues that the money was erroneously excluded from the marital estate and that Dawn did not "trace back this money to a non[]marital or pre[]marital source." Brief for appellant at 28. Dawn does not specifically address this account in her brief.

As noted previously, the record was left open following trial because certain account statements were not available at trial. Exhibit 219, which contains the annual statements for USAA Coverdell Account #3927 from 2009 to 2013, was offered and received into evidence without objection at a hearing on August 19, 2014. Exhibit 219 shows that the value of the account was: $11,019.42 on December 31, 2011; $12,585.38 on December 31, 2012; and $16,030.03 on December 31, 2013. During the hearing on August 19, 2014, the district court stated that its intent was that this account for Dawn's daughter would not be included in the division of the marital estate "because of the testimony that the contributions were predominantly from Ms. Hovey's parents and it is a child from another relationship." The court said it "saw it as -- just in Dr. Hovey's good nature that he was willing to contribute to this other child that wasn't his."

The district court's recollection of the testimony--that the contributions were predominantly from Dawn's parents--is not supported by the record. In discussing the numerous college accounts of the parties' two children and Dawn's daughter (11 accounts in total), Michael

testified that Dawn's parents gave the parties $40,000 for each of the children, which the parties put into college savings accounts. Dawn's testimony was similar. She said that her parents gave each child $40,000 to start their college account. There was no evidence as to which of Dawn's daughter's three college accounts (two of which were not set aside as nonmarital property) that the $40,000 gift was deposited into; nor any evidence that any of that money was deposited into USAA Coverdell Account #3927. Interestingly, USAA Coverdell Account #3927 had the lowest value of her daughter's three accounts on December 31, 2011 ($11,019.42), whereas the other two educational accounts had over $43,000 and $55,000 on that same date.

Dawn failed to trace any of the $40,000 gifted from her parents to USAA Coverdell Account #3927. And although Dawn testified that she had been "giving to an account" from the time her daughter was six months old, she again failed to trace how much money was deposited before the marriage and into which account. Dawn has not met her burden to prove that USAA Coverdell Account #3927 should be set aside as her nonmarital property. See *Brozek v. Brozek*, 292 Neb. 681, 874 N.W.2d 17 (2016) (separate property becomes marital property by commingling if inextricably mixed with marital property; burden of proof rests with party claiming property nonmarital). Accordingly, the district court abused its discretion in setting aside USAA Coverdell Account #3927 to Dawn as separate from the marital estate.

We note that in the section of the amended decree titled "Children's Investment Accounts," there were 10 other investment accounts listed: two accounts for Dawn's daughter, and four accounts each for the parties' two children. Each of these 10 investment accounts was an educational or college savings account of some sort. And each account was awarded to either Dawn (5 accounts) or Michael (5 accounts) for "supervision and maintenance" and the parties were not to convert the accounts for their own use or benefit. The district court ordered "[t]he funds are to be used solely for the educational benefit of the children."

Michael does not appeal the handling of these other 10 accounts, two of which are for the benefit of Dawn's daughter and were awarded to Dawn for "supervision and maintenance" (including one account that was in Michael's name along with Dawn's daughter). Based on our de novo review of the record, there was no reason for the district court to treat USAA Coverdell Account #3927 differently than the two other educational accounts established for the benefit of Dawn's daughter. Michael does not challenge on appeal the court's treatment of those two other accounts. Accordingly, we follow the language used by the district court for the other educational accounts and we now order that Dawn is awarded "supervision and maintenance" of USAA Coverdell Account #3927, and the account "shall not be converted for the use or benefit" of Dawn. "The funds are to be used solely for the educational benefit" of her daughter.

(c) Chevy Suburban

Michael also argues that the court miscalculated the value of Dawn's vehicles as $32,723 because "the numbers on the chart actually add up to $35,943." Brief for appellant at 18. Dawn responds that the $3,220 difference Michael alludes to relates to a 2003 Chevrolet Suburban that appears in a table in the amended decree, but the value of the Suburban was not included in the total dollar value of Dawn's vehicles because "this vehicle simply does not exist," and the "listing of the Suburban was a scrivener's error" which had no bearing on the outcome. Brief for appellee

at 6. Dawn notes that the Suburban did not appear in a different portion of the amended decree where the district court specifically ordered which party was to receive each vehicle, did not appear in the original decree, and is not referenced anywhere in the trial record.

We have reviewed the record and concur with Dawn that the listing of the Suburban was a scrivener's error. She correctly states that the Suburban was not referenced anywhere in the trial record. Furthermore, attached to the original decree is an email to the parties from the trial judge dated May 1, 2014, wherein the judge specifically stated the reference to the Suburban in the letter findings "shall be stricken as no evidence was submitted during trial or otherwise for such a vehicle." Accordingly, the trial court correctly valued Dawn's vehicles at a total of $32,723.

### (d) Valuation of Accounts

In the amended decree, the district court repeatedly stated that the parties' investment, retirement, and bank accounts would be "divided equally" and valued as of July 1, 2011 (the date Michael filed for divorce), but if the evidence was insufficient to determine value as of July 1, then the court would assign value as of November 12 (the date of physical separation). The district court stated in the amended decree, "Various activities of both parties involving withdrawing or moving money from accounts warrants the imposition of a valuation date supported by the evidence and in the interest of fairness. Therefore, valuation dates were determined by amounts supported by the evidence and would not receive guess or speculation as to value."

Michael argues that the district court erroneously valued various accounts held by the parties.

### (i) Investment and Retirement Accounts

Michael argues that many of the investment and retirement account values set forth in the amended decree fail to conform to the amount on the referenced exhibit. He further contends that the court did not follow its own finding that values would be determined as of July 1 or November 12, 2011, which resulted in incorrect valuations. He requests review of five specific accounts and states that "the difference in values complained of, taken as a whole, is alarming." Brief for appellant at 22.

Dawn does not specifically respond to Michael's assertions with regard to each individual account. Instead, she generally contends that "[w]hile the Court may have utilized differing amounts from differing dates, the overall allocation between the parties is equitable" because it conforms to the general rule that a spouse be awarded "one-third to one-half of the marital estate." Brief for appellee at 8-9. She further points to the hearing on Michael's motion to reconsider these items and values wherein the district court said, "I did the best that I could with the limited testimony I had directing the Court, and I looked at the evidence as it was submitted." Dawn argues that "[t]he trial court's statements are indicative of its decision to award the amounts specified in the decree exactly as it was set forth in the decree, without regard to whether the date was exactly correct or not." Brief for appellee at 9.

As stated previously, in the amended decree, the district court repeatedly stated that the parties' investment, retirement, and bank accounts would be "divided equally" and valued as of July 1, 2011 (the date Michael filed for divorce), but if the evidence was insufficient to determine

value as of July 1, then the court would assign value as of November 12 (the date of physical separation). However, at post-trial hearings, particularly the hearing held on August 19, 2014, the court expressed its frustration, stating: "[T]his case quite frankly has been a mess. There's a lot of paper. And my intention was to capture the value of those accounts at the date of separation so that that could be the value that's divided equally." The court noted that the testimony about the accounts was "very vague," and there was evidence that the parties continued to use the accounts and money was being manipulated in the accounts during the separation, and that was "one of the main reasons for using the date of separation, either the filing or the physical separation[.]" In denying the motion for new trial, the court stated: "I made my findings and separated it out knowing that the case law allows a division of assets to be somewhere between one-third and one-half[,] [a]nd I don't think that this puts that anywhere near falling below one-third." But the court then said, "I'm saying I did the best I could to be fair to both parties and try and recognize values that were closest to the date of separation to the best of my ability."

From our reading of the record and the amended decree, it is clear that the district court intended to value the accounts as of July 1, 2011, as long as there was sufficient evidence to do so. To the extent that the evidence was insufficient to determine value on July 1, then the court would value the account as of November 12. It is also clear that the district court did the best it could with voluminous exhibits and little testimony to direct the court to the important information within those exhibits. And this court had the added benefit of being presented a much more organized record than the record presented to the district court. As will be explained below, after reviewing the record presented to us, we find there was sufficient evidence to determine the value of each of the disputed accounts as of July 1; this includes recognizing that an ending account balance on June 30 would be the beginning balance on July 1. Accordingly, we find that the district court's deviation from its stated valuation dates was an abuse of discretion because, as the court noted, money was often being moved in and out of the parties' various accounts. Using different valuation dates for different accounts could and did lead to double-counting of some funds, and could also result in some funds being unaccounted for all together. Additionally, dividing a marital estate between the parties on a one-third to one-half basis first requires a determination of what is marital and nonmarital, and also requires an accurate valuation of the assets and liabilities in the marital estate before that division can take place. See *Stanosheck v. Jeanette*, 294 Neb. 138, 881 N.W.2d 599 (2016).

### a. Watz Surgical Group LLC (401K) account

Referencing trial exhibits 60 and 61, the district court valued the Watz Surgical Group LLC (401K) at $366,026. We have reviewed the exhibits and determine that $366,026 was the account value on March 31, 2013 (exhibit 60, page 16). In its amended decree, the court specifically stated "the evidence supports a valuation of the Watz Surgical Group Account to be valued at $366,026 based on the evidence and in the interest of fairness." There is no further explanation as to why it was "in the interest of fairness" to value the account more than one year after either of the court's specified valuation dates of July 1 or November 12, 2011.

Michael argues that the account should have been valued at $235,722.59 (exhibit 61, page 1), which was the value of the account on June 30, 2011, one day before the divorce proceeding

- 14 -

was filed. We agree. Michael was the sole contributor to his 401(K) and should be entitled to any contributions after the date of the parties' separation. There is no reason apparent from the record why any later date should be used. Accordingly, we find the district court's use of a later date was an abuse of discretion, particularly in light of its own determination that the July 1 or November 12, 2011, dates would be used. See *Brozek v. Brozek*, 292 Neb. 681, 874 N.W.2d 17 (2016) (date on which court values marital estate should be rationally related to property composing marital estate). We find that the account should have been valued at $235,722.59, and the district court overvalued the marital portion of the account by $130,303.41.

### b. TD Ameritrade Account #9803

Referencing trial exhibits 63 and 64, the district court valued TD Ameritrade Account #9803 at $40,947. Michael states that exhibit 63 shows the total value of the account was $38,161.42 as of June 30, 2011.

Neither exhibit 63 nor 64 supports the district court's value of $40,947 for TD Ameritrade Account #9803; that value does not correlate to any statement in the record before us. Michael is correct that exhibit 63, page 1, shows the total value of the account was $38,161.42 as of June 30, 2011, and that is the value that should have been used. Accordingly, we find that the district court overvalued the account by $2,785.58.

### c. TD Ameritrade Account #xxx-xx3949 (#3949)

Referencing trial exhibit 62, the district court valued the TD Ameritrade Account #3949 at $25,553. Michael claims that the court's valuation does not correlate to any account statement and is not supported by the record. However, we find that the court's valuation is found in exhibit 62, page 71, and reflects that account value on November 30, 2012, more than one year after either of the court's specified valuation dates. And as Michael points out, exhibit 62, page 1, shows the total value of the account as of June 30, 2011, was $23,833.18, and that is the value that should have been used. Accordingly, we find that the district court overvalued the account by $1,719.82.

### d. USAA Brokerage Account #xxxx8731 (#8731)

Referencing trial exhibits 65 and 227, the district court valued USAA Brokerage Account #8731 at $51,372. We find that the court's valuation is found in exhibit 65, page 1, and reflects that account's value on December 31, 2012, more than one year after either of the court's specified valuation dates.

Michael argues that this account is "particularly problematic" because it "is a holding account used by Michael to pay ordinary monthly expenses *after the filing of the divorce*" and as such, "the balance on that account fluctuated greatly and regularly." Brief for appellant at 21 (emphasis in original). He also argues that a valuation date of December 31, 2012, "results in double-counting of monies" because funds were routinely transferred from this account to other accounts whose values were also set as of July 1 or November 12, 2011. Brief for appellant at 21. He further argues that this account was funded by USAA Brokerage Account #xxxx7354 (#7354), "making the double-counting error even more egregious." *Id.*

Having reviewed the record, we find that there were corresponding withdrawals from account #7354 (exhibit 66, page 15) and deposits into account #8731 (exhibit 227, page 4) of $65,000 on July 19, 2011, and $54,500 on September 2. Thus, the district court's use of different valuation dates for account #8371 (December 31, 2012) and account #7354 (December 31, 2010) would result in a "double-counting" error as claimed by Michael.

Exhibit 227 also reflects that USAA Brokerage Account #8731 was valued at $0 on December 31, 2010. No account activity occurred until July 19, 2011, and the account balance on December 31 was $586.53. The exhibit supports Michael's testimony at trial and argument in his brief that USAA Brokerage Account #8731 was a holding account created after the parties separated. For example, exhibit 65 shows that between December 31, 2010, and December 31, 2011, there were $124,516 in deposits and $123,931.34 in withdrawals in this account; remembering that there was no account activity until July 19, after Michael filed for divorce. Exhibit 65 also shows that between December 31, 2011, and December 31, 2012, there were $217,803.91 in deposits and $167,027.61 in withdrawals in this account. Although the exhibit reflects that the account value was $0 on July 1, 2011, Michael asserts that "[t]his account should be valued at $586.53." Brief for appellant at 22. We accept his account valuation of $586.53. Accordingly, we find that the district court overvalued the account by $50,785.47.

### e. USAA Brokerage Account #7354

Referencing trial exhibits 66 and 155, the district court valued USAA Brokerage Account #7354 at $193,901. We find that the court's valuation is found in exhibit 66, page 8, and reflects that account value on December 31, 2010, six months before Michael filed for divorce. As Michael points out, exhibit 66, page 1, shows the total value of the account was $184,114.59 as of June 30, 2011, and that is the value that should have been used. Accordingly, we find that the district court overvalued the account by $9,786.41.

### f. Summary for Investment and Retirement Accounts

We now create a chart similar to the one found on page 11 of the amended decree for the investment and retirement accounts, with the corrected valuations. The accounts in bold are those that were at issue on appeal for which corrected amounts have been used. The accounts in normal font were not appealed and remain unchanged from the amended decree; the Fidelity Destiny account is initially in normal font because the value of the account was not challenged on appeal, only whether any portion should be considered nonmarital.

| | |
|---|---|
| **Watz Surgical Group LLC (401K)** | **$235,722.59** |
| Thrift Savings Acct ending in #4647 | $ 22,289.00 |
| **TD Ameritrade Acct #9803** | **$ 38,161.42** |
| **TD Ameritrade Acct #3949** | **$ 23,833.18** |
| **USAA Brokerage Acct #8731** | **$      586.53** |
| **USAA Brokerage Acct #7354** | **$184,114.59** |
| Fidelity Destiny Plan Acct. #1454-7 | $   8,540.00 |
| USAA Simple IRA Acct #xxxx9565 | $  18,621.00 |
| USAA Roth IRA Acct #xxxx8383 | $  28,509.00 |

| | |
|---|---|
| USAA Simple IRA Acct #xxxx8427 | $ 16,266.00 |
| USAA SEP IRA Acct #xxxx5172 | $ 6,685.00 |
| USAA IRA R/O Acct #xxxx6536 | $ 44,989.00 |
| TOTAL Investment/Retirement Accounts | $628,317.31 |
| TD Ameritrade Acct #9803 | ($ 12,843.00) |
| **Fidelity Destiny Plan Acct. #1454-7** | **($ 2,693.52)** |
| ADJUSTED Marital Estate: | $612,780.79 |

As stated by the district court, the marital estate for investment and retirement accounts shall be divided equally. And "[t]he parties shall each be awarded any gains or losses on their one-half portion of the accounts since time of separation to time of division." Neither party has appealed this aspect of the amended decree.

### (ii) Bank Accounts

The parties arguments related to the bank accounts are similar to those made with regard to the valuations of the investment and retirement accounts. Again, the district court intended to value the accounts as of July 1 (if there was sufficient evidence) or November 12, 2011. We again conclude there was sufficient evidence to determine the value of each of the disputed accounts as of July 1.

### a. USAA Savings Account #1073-8

Referencing trial exhibit 50, the district court valued USAA Savings Account #1073-8 (awarded to Michael) at $2,520. Michael states that exhibit 50 shows the total value of the account was $1.13 as of July 1, 2011.

Our review of exhibit 50, page 65, shows that $2,519.28 was withdrawn on June 29, 2011, just two days before Michael filed for divorce. After the withdrawal, there was $1 in the account to which 13 cents of interest was credited on July 15, giving rise to Michael's valuation of $1.13. Because the withdrawal was made so close to when Michael filed for divorce, we cannot say that the district court abused its discretion in valuing the account at $2,520.

### b. Omaha State Bank Savings Account #xxxxxx5980 (#5980)

The Omaha State Bank Savings Account #5980 (awarded to Dawn) appears to be in Dawn's name and is designated "Money Market Plus" on the bank statements. Referencing trial exhibit 46, the district court valued this account at $15,229. We find that the court's valuation is found in exhibit 46, page 53, which shows that account value on February 19, 2013, more than one year after either of the court's specified valuation dates.

Michael states that exhibit 46 shows the total value of the account was $38,279.99 as of June 16, 2011; $38,290.37 as of July 19; and $38,328.47 as of November 17. Thus, "[t]here is no plausible explanation for the value placed upon this account by the Court; it is obvious that a correct account value hovers around $38,300, as the balance on that account remained steady through each of the court's stated valuation dates." Brief for appellant at 23.

Having reviewed exhibit 46 (pages 92 and 93), we note that the beginning balance for account #5980 on June 8, 2011, was $0; that same day a deposit of $38,277.16 was made into the account. We can see that the $38,277.16 transferred into account #5980 came from Omaha State Bank Checking Account #4854, which shows that on that same day, the same amount was transferred into #4854 from Omaha State Bank Checking Account #1147 (joint account). Account #4854 was awarded to Michael with a stated account value of $0. Account #1147 was awarded to Dawn with a stated account value of $2.44. Thus, it appears that the $38,277.16 was funneled through account #4854 which had a zero account balance before and after the transfers on June 8. Neither account value for #4854 or #1147 is at issue on appeal. Exhibit 46 supports Michael's testimony at trial that Dawn took $38,000 from their joint account #1147 (leaving essentially no money in that account) and put it her account #5980.

And as asserted by Michael, exhibit 46 (pages 93, 96, and 105) shows the value of account #5980 was $38,279.99 as of June 16, 2011, $38,290.37 as of July 19, and $38,328.47 as of November 17. There were no deposits or withdrawals from June to November, and the only reason the value changed is because interest was credited to the account. Averaging the account values for June 16 and July 19, we find that the account value around July 1 was $38,285.18; and this is the value that should have been used. Accordingly, the district court undervalued the account by $23,056.18.

### c. USAA Savings Account #2389

Referencing trial exhibit 47, the district court valued the USAA Savings Account #2389 (awarded to Dawn) at $14,108. In reaching that value, the court stated that it used the value of the account as of the statement provided at trial ($111,023), then subtracted $50,000 for inheritance money Dawn received and $38,000 for the money transferred to this account for child support paid for Dawn's daughter. The district court said: "The basis for the deductions is that these transfers occurred in 2009 two years prior to the filing for dissolution and [Michael] did not object to the transfers at the time. Also, the testimony at trial by [Michael] was that he was not seeking any of these funds." We previously found that the $88,000 should not have been set aside as nonmarital property, and reversed that portion of the district court's amended decree finding otherwise.

As noted by Michael, exhibit 47, used by the trial court, only shows statements from November 2012 to April 2013, and nowhere does an account value of $111,023 appear in that exhibit. However, exhibit 212 contains statements from June 2009 to December 2012, and reflects an account value of $111,022.67 on June 15, 2011 (page 60), and $111,936.02 on July 31 (page 61). After a de novo review of the record, we cannot say that the district court abused its discretion in finding the total value of USAA Savings Account #2389 was $111,023.

### d. Summary for Bank Accounts

We now create a chart similar to the one found on page 12 of the amended decree for the bank accounts, with the corrected valuations. The accounts in bold are those that were at issue on appeal, and we have used corrected valuations where applicable. The accounts in normal font were not appealed and remain unchanged from the amended decree.

Michael was awarded the following bank accounts:

| | |
|---|---|
| Security National Checking Account #8961 | $ 12,170.00 |
| Omaha State Bank Checking Account #4854 | $ 0.00 |
| USAA Checking Account #xx79-01 | $ 1,570.00 |
| **USAA Savings Account #1073-8** | **$ 2,520.00** |
| USAA Checking Account #5991-1 | $ 2,519.00 |
| Total | $ 18,779.00 |

Dawn was awarded the following bank accounts:

| | |
|---|---|
| Omaha State Bank Account #1147 | $ 2.44 |
| **Omaha State Bank Savings Account #5980** | **$ 38,285.18** |
| USAA Checking Account #7743-1 | $ 2,524.00 |
| **USAA Savings Account #2389** | **$111,023.00** |
| Total | $151,834.62 |

As stated by the district court, the marital estate for bank accounts shall be divided equally. Accordingly, as modified, Dawn is ordered to pay Michael a bank account equalization payment of $66,527.81. And as ordered by the district court (and not appealed here), "[t]he parties shall each be awarded any gains or losses on their one-half portion of the accounts since time of separation to time of division."

## 2. ALIMONY

Michael was ordered to pay alimony of $2,000 per month for 84 months. Michael argues that the district court erred in awarding Dawn alimony, both in terms of amount and duration, particularly in light of Dawn's historical and current earnings, work history, and substantial property settlement award. He argues that Dawn did not need extra income to get proper training for employment or to increase her viability in the job market.

In considering alimony, a court should weigh four factors: (1) the circumstances of the parties, (2) the duration of the marriage, (3) the history of contributions to the marriage, and (4) the ability of the party seeking support to engage in gainful employment without interfering with the interests of any minor children in the custody of each party. *Brozek v. Brozek*, 292 Neb. 681, 874 N.W.2d 17 (2016). In addition to the specific criteria listed in § 42-365, a court should consider the income and earning capacity of each party and the general equities. *Brozek, supra*.

The statutory criteria for dividing property and awarding alimony overlap, but the two serve different purposes and courts should consider them separately. *Id*. The purpose of a property division is to distribute the marital assets equitably between the parties. *Id*. The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances and the other criteria enumerated in § 42-365 make it appropriate. *Brozek, supra*.

Before the parties met, Michael had finished medical school, earning his M.D., and Dawn had earned a master's degree. The parties were living in Kansas when they met and dated. Before their June 2000 wedding, Michael accepted a residency job offer in Iowa. Dawn and her daughter moved to Iowa a month before the wedding, in May, and Michael moved to Iowa in June. In

Kansas, Dawn was the director of the Menninger Foundation. She left that position to be the director of the Greater Des Moines Community Foundation, with a starting salary of $50,000. After a year and a half, in 2001, Dawn left her position at the Greater Des Moines Community Foundation and took a job at the Broadlawns Medical Center Foundation in Des Moines, Iowa, where, according to Michael, she earned $87,000 per year. After leaving her position at Broadlawns in 2003, Dawn took a job at the Iowa Foundation for Medical Care where she started their corporate program for philanthropic giving; she testified that she worked at the Iowa Foundation for a year and a half, and worked 20 hours per week.

In 2004, Michael finished his residency and the parties moved to Wichita Falls, Texas, for two years so that Michael could finish his commitment to the Air Force (he had gone to medical school on an Air Force scholarship). While in Texas, Dawn did not work outside of the home.

In 2006, the parties moved to Omaha, Nebraska, where Michael took a job as a general surgeon at Watz Surgical Group. Dawn did not work outside of the home until 2008 when she took a job as the president and CEO of the Pottawattamie County Community Foundation in Council Bluffs, Iowa. According to Michael, Dawn's starting salary was $78,000. Dawn was still employed at the Pottawattamie County Community Foundation at the time of trial in June 2013.

The child support calculation, which neither party disputes, shows that Michael earns a gross monthly income of $33,213 ($398,556 per year), and Dawn earns a gross monthly income of $6,227 ($74,724 per year). "It is true that alimony is not a tool to equalize the parties' income, but a disparity of income or potential income might partially justify an alimony award." *Anderson v. Anderson*, 290 Neb. 530, 539, 861 N.W.2d 113, 121-22 (2015).

Michael argues that other than a brief period of time early in the marriage, Dawn worked in a professional capacity throughout the marriage earning good money. He also points out that she had been awarded $67,641.50 in cash (equity from the marital home), $405,427 in investment monies, $31,863 in bank account monies, and was allowed to set off $88,000 in funds she claimed to be nonmarital. Additionally, she was awarded $1,675 per month in child support based upon a joint custody schedule. Finally, he argues that Dawn presented a variety of monthly living expenses that, when pressed, she acknowledged were speculative in nature, and many were counted as monthly expenses when they were actually one-time annual fees. He states that "Dawn's counsel makes it a point to indicate that they 'were projecting a lifestyle for her that's different than the lifestyle she currently has.'" Brief for appellant at 33.

Dawn argues that the alimony award was reasonable given the circumstances of the parties, the length of the marriage, and the history of contributions to the marriage. Dawn states that the parties were married for nearly 14 years at the time the original decree was entered, and had two children. The parties were married in Kansas and moved to Iowa, then Texas, and finally Nebraska so that Michael could complete a general surgery residency and honor his commitment to the Air Force. To accommodate these moves, Dawn had to resign employment positions and gave up an opportunity to obtain a PhD (Michael claims that Dawn's references to an abandoned PhD program were unsupported by any evidence other than Dawn's assertions). Dawn states she was a stay-at-home mother from 2004 (when the parties moved to Texas) until 2008. She claims her average annual income for 2010 to 2012 was $74,715, which is less than the $87,000 annually she was earning prior to 2004.

The evidence in the record supports the district court's decision to award alimony to Dawn. Dawn's career was interrupted by having to move to different locations to support Michael's career. She also stayed at home with the children for a number of years. Michael argues, however, that the court should be "mindful of both the division of property made by the trial court, the amount of child support ordered and Dawn's current earnings." Brief for appellant at 32. He points out that Dawn was awarded $405,427 in investment monies, $31,863 in bank account monies, and was allowed to set off $88,000 in funds she claimed to be nonmarital. It is true that when entering a decree for alimony, a court may take into account all of the property owned by the parties at the time of entering the decree, whether accumulated by their joint efforts or acquired by inheritance. See *Bauerle v. Bauerle*, 263 Neb. 881, 644 N.W.2d 128 (2002). However, our modification of valuations of various accounts and restoration of certain property to the marital estate did not favor Dawn; she ended up with significantly less than what was awarded to her by the district court. After a de novo review of the record and considering the circumstances of this case, we conclude that the alimony award is not an abuse of discretion.

## VI. CONCLUSION

For the reasons stated above, we find that the district court abused its discretion when it failed to set aside Michael's nonmarital portion of the Fidelity Destiny account, and we modify the district court's amended decree accordingly. We also find that the district court abused its discretion when it set aside $88,000 in inheritance and child support monies as Dawn's nonmarital property, and we reverse that portion of the district court's amended decree. We further find that the district court abused its discretion in using valuation dates inconsistent with its stated valuation dates for some of the parties' investment, retirement, and bank accounts; we were able to determine the correct values for the accounts as set forth previously in this opinion and we modify the amended decree accordingly. Finally, we find that the district court's award of alimony to Dawn was not an abuse of discretion and it is affirmed.

AFFIRMED IN PART, AFFIRMED IN PART
AS MODIFIED, AND IN PART REVERSED.